341 So.2d 671 (1976)
Lacey H. NICHOLS, III, who sues as Administrator of the Estate of Lacey H. Nichols, Jr., Deceased,
v.
SEABOARD COASTLINE RAILWAY CO., a corp., et al.
SC 1590.
Supreme Court of Alabama.
December 30, 1976.
Rehearing Denied February 4, 1977.
*672 Selman & Beard, Jasper, and Hogan, Smith & Alspaugh by W. Clay Alspaugh, Birmingham, for appellant.
Morris W. Savage of Bankhead, Savage & Stephens, Jasper, for appellees.
JONES, Justice.
Plaintiff, Lacey H. Nichols, as personal representative of his deceased father, appeals from an adverse judgment and order overruling his motion for a new trial. The suit is based on a crossing accident claiming damages for wrongful death against Seaboard Coastline Railway Co. and its employee, Jim C. Laird.
The sole dispositive issue may be stated: Where extraneous material was introduced into the jury's deliberations, must actual prejudice be shown to work a reversal of the verdict? We hold that the character and nature of the extraneous material in this case constitutes prejudice as a matter of law and no showing that the jury was in fact influenced thereby in arriving at their verdict is necessary. The trial Court erred in overruling the motion for a new trial; therefore, we reverse and remand.
Because each "extraneous matter" case must be decided in light of its particular facts and attending circumstances, it is essential that we set forth the factual context in which this issue is presented. Following the close of the evidence (May 28), the Court gave a rather lengthy jury instructionboth oral and written requested chargesincluding, for example, the legal definitions of negligence, contributory negligence, subsequent negligence, subsequent contributory negligence, and wantonness.
After deliberating for some period of time, the jury came in and asked the Court the following question:
"Judge, we ask for more clarification on negligence. We are confused. We can't remember all that we heard and could we have that? That is what has us confused. There was more than one kind and we are confused."
The Court responded:
"Let me ask this before answering your question, would you gentlemen like to go home and get a good night's rest and come back tomorrow and take up? It would be improper for the Court to recharge on the law. You have been charged on the law, and it would be improper for the Court to undertake to charge all of it. For that reason, I wonder if you . . . you are like the rest, you are tired and I wonder if you would like to go home and come back tomorrow. We will get out and let you decide."
The following morning (May 29), upon the jury's arrival in the courtroom, the Court said:
"Mr. Foreman, in regard to your statement made by you as foreman of the jury to the Court yesterday afternoon before you adjourned for the night, the Court wants to state this in regard to additional instruction. The Court feels it would be improper to rehash what has already been given. Court might not use the same language and there might be different interpretations put on it and the Court feels it might be improper. If there is additional instructions as to the law that the Court didn't charge on that is applicable in the case, I think that would be proper, but the Court doesn't know of any law that it did not charge on that he feels is applicable. If you would like to just briefly apprise the Court of what the jury had in mind for additional instructions, all right, or if you feel, all of you feel, that you are now ready to go back and deliberate and have discussions and it might clarify things then we will withdraw and let you go right in to your work this morning."
The jury foreman responded:
"Your Honor, I think . . . what we wanted was clarification and not instructions. That was the way I asked for it. But, I believe we can go ahead this morning."
*673 One of the grounds of Nichols' motion for a new trial raised the "extraneous matters" issue and attached affidavits of five jurors, which, though varying as to certain minor details, stated in substance the following: Shortly after the jury began its deliberations on the morning of May 29, one of the jurors took a piece of paper from his pocket, explained that he had looked up some definitions the night before, and listed on the blackboard the terms negligence, contributory negligence, subsequent negligence, and subsequent contributory negligence. He then stated the definitions of these terms which he said he had gotten from the World Book Encyclopedia. He further advised the other members of the jury that, by the law as he understood it, if both parties contributed to the fault of the accident, the jury could not find against the defendants.
Three of the affidavits contained statements to the general effect that several members of the jury, who had felt after the first day's deliberations that the plaintiff should recover, accepted the juror's explanation of the legal terms from the World Book and changed their minds in favor of the defendants.
At the hearing on the motion for a new trial, eleven of the twelve jurors (one was physically disabled) testified in person and disclosed without material variation essentially the same account of the jury room events on the morning of May 29. Four other jurors (in addition to the one named in the affidavits) stated that they too had consulted either the World Book or the American College Encyclopedic Dictionary to clear up confusion concerning several legal words and phrases. One of these publications cites a railroad crossing accident to illustrate "negligence" and "contributory negligence." Several of the jurors testified that, in spite of the definitions of the legal terms from the reference books discussed by the jury, they based their verdict on the evidence from the "witness chair" and on the law as charged by the Court.
The trial Judge asked a jurorone of the four who testified they had consulted the world Book for definitionsthe following question:
"Did you base your verdict on what was in the book solely or did you base it on the evidence and the law that was given to you in the Court room?"
The juror answered:
"I did not base it on the book. I looked it up on what you gave us, the law and I understood that if he contributed to the accident that he could not receive . . I looked it up to be sure I understood what you gave."
Our resolution of the issue here presented presupposes two propositions:
1. We are not faced with the general rule which forbids jurors from impeaching their own verdict. This well entrenched rule relates to intrinsic influence and is based on the sound public policy of judicial administration which zealously guards the sanctity of the jury room. Dumas v. Dumas Brothers Manufacturing Company, Inc., 295 Ala. 370, 330 So.2d 426 (1976); Alabama Fuel & Iron Co. v. Powaski, 232 Ala. 66, 166 So. 782 (1936); Central of Georgia Ry. Co. v. Holmes, 223 Ala. 188, 134 So. 875 (1931).
2. Definitions of legal terms and concepts (negligence, contributory negligence, subsequent negligence, subsequent contributory negligence) from general reference books (World Book and American College Encyclopedic Dictionary) are extraneous matters and fall within the exception to the general rule which, likewise, is well recognized in our case law. Weekley v. Horn, 263 Ala. 364, 82 So.2d 341 (1955). The fact that the books themselves were not before the jury does not vitiate the operative effect of this exception to the general rule, for, indeed, there is no contention that this extraneous matter was not before the jury during its deliberations and before it reached a unanimous verdict.
Within the context of these facts and legal premises, then, the issue is narrowly focused: whether the movant bears the burden, as a matter of law, to prove to the reasonable satisfaction of the trial *674 judge that such extraneous matter was, in fact, prejudicial. Seaboard claims that the law places this burden on the movant, and that the trial Judge has resolved the factual issue of prejudice against the plaintiff and in favor of the railroad and its employee.
We disagree. We hasten to add, however, as previously noted, our holding is restricted to the particular facts and attending circumstances of the instant case. The difficulty of stating with precision a legal principle to govern the "extraneous facts" exception to the general rule was recognized in Weekley v. Horn, supra, in which Mr. Justice Mayfield, speaking for the Court, said:
"No cases are brought to our attention wherein this court has sought to define the meaning of extraneous facts within the stated exception. The cases which the appellant brings to our attention involve the consideration by juries of papers, documents, a dictionary, etc., which were not introduced into the evidence. We shall not here attempt to define and limit the term extraneous facts as embraced in the exception to the general rule."
While the concern of the Weekley Court was whether the alleged influences were extraneous (invoking the exception) or intrinsic (within the general rule prohibiting impeachment), the "extraneous influence" cases have turned chiefly on this same inquiry rather than on a definitive rule requiring proof of actual prejudice. For example, Dulaney v. Burns, 218 Ala. 493, 119 So. 21 (1928), interpreting Leith v. State, 206 Ala. 439, 90 So. 687 (1921), says, "It must appear that injury was done by the extraneous matter being before the jury." At first glance the emphasis here seems to be on the introductory phrase, "It must appear that injury was done ... " implying that movant has the burden of proving injury. The holdings of Leith and Dulaney, however, do not bear this out.
Leith rejected jury impeachment testimony because the trial judge found the extraneous matter was not before the jury until after the verdict had been reached. Dulaney holds that dictionary definitions of common words, commonly understood, did not in fact constitute extraneous matters. Thus, the proper emphasis on the quoted portion of Dulaney is, "... by the extraneous matter being before the jury." In other words, Leith found the extraneous matter was not before the jury, and Dulaney found that the matter before the jury was not extraneous. Neither turned on lack of proof that extraneous matter before the jury was not in fact prejudicial. See Louisville & Nashville Railroad Co. v. Sides, 129 Ala. 399, 29 So. 798 (1900). See also McCormick v. Badham, 204 Ala. 2, 85 So. 401 (1919).
Weighing heavily against the absolutism of a rule impeaching all extraneous matter verdicts is the well established rule that jury verdicts are presumed to be correct, and that this presumption is strengthened when the trial court, as here, refused to grant a new trial. Allred v. Dobbs, 280 Ala. 159, 190 So.2d 712 (1966). It is the head on collision course of these two dominant rulesthe presumption of correctness of jury verdicts versus the right to a fair and impartial trial, governed exclusively by the evidence given from the witness stand and the law given by the courtthat requires us to resolve this issue on a case by case basis.
Only by individual consideration of all attending circumstances of each case can it be determined which one of these fundamental rules must give way in accommodation to the other. We are unwilling to say every extraneous matter verdict must be set aside absent a factual showing to the reasonable satisfaction of the trial judge that the verdict is the prejudicial result of such extraneous matters. See, for example, Clay v. City Council of Montgomery, 102 Ala. 297, 14 So. 646 (1893).
In concluding that the "fair and impartial trial" rule must prevail in the instant case, we think it appropriate to observe that our holding is not in the spirit of blameworthiness with respect to the conduct of this jury in seeking to inform themselves on matters material to their consideration. To the *675 credit of the system, present-day jurors are not only better informed and more sophisticated, but they show an increasing willingness to serve and conscientiously discharge their civic responsibilities as the fact finders within the constitutional framework of our judicial system.
The record in this case clearly shows that several jurors became concerned over their confusion of definitions of certain legal terms. The confusion is understandable; the case, while not overly complicated factually, involved the most intricate of legal concepts of tort liability and countervailing defenses. This lack of understanding is no reflection on the accuracy or completeness of the judge's instructions to the jury. What is routine within the professional training and discipline of lawyers and judges is nonetheless novel and outside the common experience of lay jurors. Any credible verdict, reflecting justice among the parties, must of necessity apply the facts as found by the jury to the law of the case, and this application cannot be made where there is confusion and doubt as to the applicable legal concepts.
This confusion was communicated to the Court. When the Court declined to assist the jurors to a better understanding of the law applicable to the case, they were left either to proceed in their confusion or to resort to their own initiative to alienate their uncertainties. Given this choice, the jurors can hardly be blamed for looking to their home reference books during the night recess to clarify in their minds the legal concepts essential to a resolution of the case.
The quoted portion from the record of the conversation between the trial Judge and the jury foreman before deliberations resumed on the early morning of May 29 completes the story. When the Judge reiterated his reluctance to reinstruct on any matters covered in his original charge, we can hear in the foreman's actual response the further implication: "That's all right, your Honor, we understood when we were excused for the night that you would not instruct further on the points of our confusion; so, overnight, we have cleared up these matters on our own, and we are now ready to proceed without additional instructions from the Court."
Thus, it is within the context of all the circumstances attending this particular case that we hold the trial Court erred in overruling the motion for a new trial on the allegation and showing that extraneous matters were before the jury during its deliberations. The time honored assertion of our constitutional forebearers"We are a government of laws and not of men"dictates the traditional separation of functions between the court as the law giver, on the one hand, and the jury as the fact finder, on the other hand. Indeed, the record here discloses seven different references by the Court in its jury instructions to these separate functions of the court and jury. Three examples are found in the following quotations from the trial Judge's charge:
"It is further the duty of the Court to preside at the trial and pass upon matters of evidence and objections, both in the taking of testimony and in the arguments, and finally, of course, to charge you gentlemen what the law is. . . .
"The jury also has its duty, and a very important duty, and it is so for this reason; if the Court gives you a statement about what the law is and if the Court is incorrect, any party who is hurt by it may review the Court in a higher Court and have it corrected . . . It is for you and you alone to determine what the truth is from the disputes in the testimony and, of course, to take the law that the Court gives you and apply that to the truth and thus arrive at your verdict in this case. . .
". . . On the one hand is the evidence. You can't ignore the evidence nor go outside of it in deciding any issue involved. And on the other hand is the lawyou can't ignore that or set it aside."
The trial Court was not without precedential authority for these instructions. The decisional law of this State is replete *676 with clear and definitive statements of the rule. Relying on a series of earlier cases, the Court in White v. State ex rel. Hardegree, 256 Ala. 18, 53 So.2d 599 (1951), stated:
"`It is essential to an orderly administration of justice that juries should obey the instructions of the court. If the court is in error in giving instructions, the jury should, nevertheless, obey the instructions, and the injured party would have recourse by appeal to this court, which is the proper forum to pass upon the actions of the trial court.'"
The Court of Appeals, in commenting on the discretion of the trial Court in allowing an attorney to read a Code section to the jury, stated, in City of Anniston v. Oliver, 28 Ala.App. 390, 185 So. 187:
"The reason for this is obvious. The duty of the jury is to try the facts and apply such facts to the law as given them in charge by the court. It is the duty of the court to declare the law, and it is the duty of the jury to follow the law as given them in charge by the court."
Suppose, in this case, counsel for one of the parties, while addressing the jury during closing arguments, had said: "Ladies and Gentlemen of the jury, the Court is going to charge you on several very complicated legal concepts and definitions of legal terms. Because you may be left confused by all this legal talk, let me read the definition of several of these terms from the World Book Encyclopedia and the American College Encyclopedic Dictionary." The impropriety of such a practice lies not in the fact that the statement is being made by counsel (which ordinarily is within the discretionary rule) but in the source of the material.
To further illustrate the point: Under the above hypothesis, it could hardly be contended that any error in admitting such argument would be rendered harmless absent a showing that the jury was in fact influenced by such extraneous matter. This clearly falls within the category of one of those bells which the law recognizes cannot be unrung.
In conclusion, we emphasize that our disapproval of the source of the extraneous materialhere condemned as prejudicial as a matter of lawconsists not in any technical fallacy in defining the legal terms in question. We pass no judgment on the accuracy vel non of the abstract definitions of the various legal terms contained in the two reference books discussed by the jury. Rather, it is the use of any source, beyond the court itself, for instructions on the law of the case that condemns such practice.
Explanations and definitions of legal conceptseven when technically correctare rarely meaningful in the abstract. It is the interplay of these conceptsone with the otherexplained by the court to the jury, in the formal setting of the courtroom and in the context of the particular facts of a given case, that breathes life and meaning into the law of the case. Only through this orderly procedure is the jury capable of discharging its sworn duty to apply the law as charged by the court to the facts of the case "... and true verdict render according to the evidence, so help me God."
REVERSED AND REMANDED.
FAULKNER, J., concurs.
HEFLIN, C. J., concurs in the result.
BLOODWORTH, J., concurs specially.
MADDOX, ALMON, SHORES, EMBRY and BEATTY, JJ., concur with BLOODWORTH, J.
BLOODWORTH, Justice (concurring specially).
I concur in the result to reverse and remand this cause for a new trial. I do not agree with some of the reasons given nor with some of the language used in Justice Jones' opinion justifying the reversal.
I would hold that the introduction into the jury room during deliberations by jurors of definitions of "negligence" and "contributory negligence," obtained from World Book Encyclopedia, constituted the *677 introduction of "extraneous matters" which were "prejudicial" to plaintiff under the facts of this case. It is therefore that I concur in the result to reverse and remand for a new trial.
I do not agree that no prejudice need be shown in this case. I simply say that it is clear here that prejudice has been shown under the facts of this case.
Our case law has long required, in the absence of improper act of the prevailing party, that prejudice must be shown. Faust v. Miller, 260 Ala. 665, 72 So.2d 294 (1954).
See also Davis v. Damage, 328 S.W.2d 203 (1959) where the Texas Court of Civil Appeals held that the question as to the use of a dictionary by the jury to look up "proximate cause" must be shown to constitute "prejudice."
The events which culminated in the introduction of the "extraneous matter" here complained of had their origin in the eminent and distinguished trial judge's refusal to charge the jury further when they asked for additional instructions.
I think it not amiss here to strongly suggest that trial judges ought to accede to juror's requests for additional instructions or for those instructions already given to be repeated. The court reporter's notes will, of course, reflect what was said by the trial judge.
MADDOX, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.