Ada Nowogorski, as the dependent widow of Frank Nowogorski and as administratrix of his estate, filed suit against,inter alia, Ford Motor Company ("Ford"), as manufacturer of a tractor, and Spruiell Ford Tractor Company ("Spruiell"), as the seller of the tractor, for damages based on a claim that they had wrongfully caused the death of her husband. The case was tried before a jury during the week of July 31, 1989, and on August 4, 1989, the jury returned a verdict against Ford, assessing damages of $150,000, and returned a verdict in favor of Spruiell. The plaintiff filed a motion for a new trial on September 1, 1989, alleging juror misconduct and inconsistent verdicts. The court denied the motion for a new trial, and the plaintiff appealed. We reverse and remand.
The facts underlying this action basically are not in dispute. On July 25, 1984, Mr. and Mrs. Nowogorski went to Spruiell's place of business to look at tractors. Mr. Nowogorski informed Mr. Spruiell that he needed a tractor for pulpwooding. Plaintiff alleged that on or about December 7, 1984, her husband was killed when the tractor he was operating overturned and landed on him. Before the tractor overturned, Mr. Nowogorski had run over a stump with the left wheel of the tractor, causing the wheel to come off the ground. This tractor was not equipped with a rollover protection structure or a rollbar ("ROPS"). In 1980, Ford had implemented a system whereby a ROPS would be installed as standard equipment and included in the base price, but under that system either the customer or the dealer had the option of deleting it. If the customer wished to delete the ROPS, he was required to sign a "Warranty and Limitation of Liability" form provided to the dealer by Ford. When the Nowogorskis returned to purchase a new tractor from Spruiell, a model 2110 Ford tractor, the portion of the "Warranty and Limitation of Liability" form that stated that the dealer had discussed the ROPS with Mr. Nowogorski was not checked off. Spruiell had acquired this tractor from Tupelo Ford Tractor Company and at that time it was not equipped with a ROPS. There is some dispute in the record as to whether any discussion of a ROPS took place between Mr. and Mrs. Nowogorski and Mr. Spruiell. The wheels can be adjusted on a model 2110 tractor, depending on the type of work it is to be used for. Mr. Spruiell had not changed the wheel setting from the narrow factory setting after the tractor was delivered from Tupelo. There is no indication that Mr. Spruiell informed the Nowogorskis that the wheels could be adjusted. A copy of the operator's manual was given to the plaintiff and her husband upon delivery of the tractor; however, nothing in the manual states that the narrow factory wheel setting could cause the tractor to be unstable. *Page 588 
The judge instructed the jury that the plaintiff sought recovery from both defendants under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") on the ground that the defendants had failed to warn Mr. Nowogorski that the tractor was in a defective condition at the time it was sold. The judge instructed the jury that plaintiff also sought recovery from defendant Ford under the crashworthiness doctrine. The court then listed five elements that the plaintiff was required to prove in order to recover against Ford:
 "First, that the plaintiff [decedent] was involved in the tractor accident; secondly, that the tractor in which the plaintiff [decedent] was the driver was manufactured by Ford; third, that at the time of the accident, the tractor was in substantially the same condition as it was when it left the manufacturer . . .; fourth, that the tractor was defective . . .; fifth, . . . that the defect in the tractor proximately, directly, caused plaintiff's [decedent's] injuries."
Shortly after the deliberations had begun, the jury sent to the judge a note that read, "What were the five points of law for determining for or against the plaintiff?" The judge gave the jury the option of being reinstructed on the entire issue of liability or not being reinstructed at all. The jury chose the former, and the court gave the same instructions it had given earlier.
On the second day of deliberations, jury foreman Richard Allen took a Webster's New Collegiate Dictionary into the jury room. Allen read the definition of at least one word to the jury. The jury returned a verdict against defendant Ford, awarding plaintiff $150,000. The jury found in favor of defendant Spruiell.
The plaintiff claimed that she was entitled to a new trial because of the alleged juror misconduct in consulting a dictionary. She also claimed that the verdicts were inconsistent. The trial court held a hearing on the motion, and considered affidavits of the jurors and memoranda of law submitted by the parties. The affidavits of the jurors varied. Seven jurors stated with certainty that the definition of "defective" was read in the jury room. One believed, but was not certain, that this definition was read. One juror, Patricia Carr, mentioned the word "unreasonably," yet, she was not certain that its definition had been read in the jury room. Juror Deborah Day mentioned the term "unreasonable," but she could not state with certainty that its definition had been read to the jurors. Another juror, Sherry Pounders, stated that the definition of either "availability" or "available" was read in the jury room. Jury foreman Allen stated that the terms "tractor" and "safety" were read in the jury room, but he was not certain if he read the definition of "safety" aloud. The affidavit of juror Cedric Barnes is as follows:
 "When we first started our deliberations I was more in favor of Mrs. Nowogorski than I was Ford. After Foreman Richard Allen read the definition of 'defective' out of a dictionary to the rest of us, I was more in favor of Ford than I was Mrs. Nowogorski. There were several other definitions read from the dictionary to the jury by Richard Allen, but I do not recall what those words were."
After the hearing, the trial court denied the motion for a new trial.
Two issues are presented on appeal: (1) Whether the trial court erred in denying the plaintiff's motion for a new trial on the basis of juror misconduct in considering evidence not presented at trial, and (2) whether the trial court erred in denying plaintiff's motion for new trial, which alleged that the jury's verdict was inconsistent and contradictory.
 I.
Jury foreman Allen stated in his affidavit that he carried the dictionary into the jury room because some of the judge's charges were confusing to the jurors and because some of the jurors had different opinions as to what certain words in the charge meant. In the court's oral charge, the jury was charged, in part:
 "I'm going to get to it in just a minute the real issue in the case which is whether or not the product in question was defective. *Page 589 
 "Now, again, the plaintiff charges that the tractor was defective in the manufacturing and the warning when used as it was intended or was reasonably foreseeable to be used. Defective means unreasonably dangerous.
 "Now, our Supreme Court has not selected one specific definition of defect. Defective may also mean not reasonably safe when applied to its intended use in the usual and customary manner. Unreasonably dangerous, that is, dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics. It could mean not reasonably safe or unreasonably dangerous, in other words, not fit for its intended purpose, or it could mean does not meet the reasonable expectations of an ordinary consumer as to its safety, or so dangerous that a reasonable man would not sell the product if he knew the risk involved, or unsafe when put to its intended use, or unreasonable risk of harm, or exposed expected users of the product not reasonably safe to unreasonable risk, or dangerously unsafe, or not reasonably safe when used for its intended purpose."
We considered the question of when juror misconduct justifies the granting of a new trial, in Whitten v. Allstate Ins. Co.,447 So.2d 655 (Ala. 1984), where we stated the rule to be as follows:
 "Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law."
Id. at 658. In determining that a new trial should have been granted in Whitten, the Court reviewed the affidavits and testimony in the case and determined that the jurors were prejudiced by the unauthorized viewing of the scene of the accident and by the subsequent discussions about those views. Two of the jurors stated that the extraneous matter had influenced their decisions, even though several other jurors stated that the extraneous matter had not influenced their decisions. We concluded that the trial court could not have found that the extraneous material was not prejudicial, since there was undisputed evidence that the extraneous material had influenced two jurors to change their minds. In each of the cases in which we have held that the trial court erred in failing to grant a new trial, there has been a common factor —the existence of juror misconduct that could have affected theverdict. See Hallmark v. Allison, 451 So.2d 270 (Ala. 1984);Nichols v. Seaboard Coastline Ry., 341 So.2d 671 (Ala. 1976).
The plaintiff contends that she was prejudiced by juror misconduct as to both defendants and as to damages. It is clear that extraneous facts were introduced into the jury's deliberations. It is also clear from juror Cedric Barnes's affidavit that the extraneous facts did influence at least Barnes's decision.
In Hallmark, the affidavit of one juror indicated that after the first day of deliberations two jurors took measurements of pick-up trucks; that they discussed and demonstrated their measurements and findings with other jurors; and that "the height of the truck and the boy was important in reaching their decision because it would be physically impossible for the boy to hit the windshield while standing straight up." In the case at bar, an important issue from the defendant's standpoint is whether the tractor was defective. The plaintiff's contention is that the tractor was defective. Therefore, the definition of the word "defective" given to the jury was critical in determining a proper verdict. The jurors apparently understood the importance of this word well enough that they debated the meaning of it and then consulted a dictionary in order to resolve the question. In reversing the judgment of the trial court in Hallmark, we said that we were unable to determine whether the introduction of the extraneous facts did change the decision of the jurors, but consideration of the extraneous facts was crucial in resolving a "key material issue in the case," and we concluded that "the trial court could not reasonably have found that the introduction of the extraneous matter *Page 590 
into the jury's deliberations was not prejudicial."
As it was noted in In re Collins' Will, 18 N.J. Misc. 492, 15 A.2d 98, 100 (1940), "the manifest need of a dictionary seems to refute the assumption that the jury understood and remembered the instructions." It has long been the law in this state that the jury is bound by the theory of law as charged by the trial court, and that it has no right to depart from it. Even if the instructions given by the court are erroneous, the jury must obey those instructions; and when the jury fails to do so, the trial court is justified in setting aside the verdict and granting a new trial. Burkett v. Burkett,542 So.2d 1215 (Ala. 1989).
In Nichols v. Seaboard Coastline Ry., 341 So.2d 671
(Ala. 1976), this Court held that one juror's presenting to others, during deliberations, encyclopedia definitions of negligence, contributory negligence, subsequent negligence, and subsequent contributory negligence, coupled with four other jurors' consulting either encyclopedias or dictionaries to clear up confusion concerning several legal words and phrases, constituted prejudice as a matter of law that required a reversal. In Nichols, we held that the character and nature of the extraneous material constituted prejudice as a matter of law and that no showing that the jury was, in fact, influencedthereby in arriving at its verdict was necessary. However, we also limited this to a case-by-case determination to be made in light of the particular facts and attending circumstances.
In Nichols, we held that "the use of any source beyond the court itself, for instructions on the law is prejudicial as a matter of law." Id. at 676. "This clearly falls within the category of one of those bells which the law recognizes cannot be unrung." Id. Further,
 "explanations and definitions of legal concepts — even when technically correct — are rarely meaningful in the abstract. It is the interplay of these concepts — one with the other — explained by the court to the jury, in the formal setting of the courtroom and in the context of the particular facts of a given case, that breathes life and meaning into the law of the case. Only through this orderly procedure is the jury capable of discharging its sworn duty to apply the law as charged by the court to the facts of the case."
Id. at 676.
It is well settled that if the verdict could have been affected by the juror misconduct, then a new trial is justified. We have carefully examined the record in this case. Mrs. Nowogorski's claim that the jurors' verdict was affected by the reading of some key definitions out of Webster's NewCollegiate Dictionary is supported by the affidavits presented. Here, as in Whitten and Nichols, at least one juror testified that his decision about the case was influenced by the extraneous dictionary definitions to be "more in favor" of Ford than in favor of the plaintiff. This evidence is sufficient to prove that the verdict was affected by juror misconduct. Thus, the trial court erred in not granting plaintiff's motion for a new trial, both as to Ford and Spruiell.
 II.
Because we must reverse on the basis of the jury's misconduct, we pretermit any discussion of the "inconsistent and contradictory verdicts" issue.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and STEAGALL, JJ., concur.