[1] The notice of appeal named the appellee as "Willie Fred Fomby by and through his mother, next friend and guardian Sara Fomby." The appeal has been restyled to correspond with the record.
Willie Fred Fomby, by and through Sarah Embry, the conservator of his estate, brought this medical malpractice action, claiming that the defendant, Dr. Bernard Pearson, had rendered negligent emergency room treatment and that that negligent treatment had caused Fomby to suffer severe injuries. The case was tried before a jury, beginning on October 23, 1995; the jury returned a verdict for the plaintiff. Dr. Pearson moved for a new trial on the grounds of juror misconduct, alleging that a juror had consulted a dictionary for a definition of the word "standard" and had told other jurors what he had discovered, in an effort to resolve the issue whether the doctor's medical treatment had breached the "standard of care." The trial court denied the motion, and Dr. Pearson appeals. The alleged juror misconduct was brought to the court's attention through the affidavit of another juror. We hold that the juror's affidavit was insufficient, standing alone, to require a new trial, but, because it is impossible to determine on the record before us whether the jury was influenced by the extraneous dictionary definition, we reverse and remand for the trial court to answer that question.
The events giving rise to this action are basically undisputed. On February 19, 1992, at approximately 11:24 a.m., Fomby sought medical attention in the emergency room of Citizens Hospital in Talladega. Fomby has epilepsy and had suffered a seizure at work. Dr. Pearson was the physician on duty in the emergency room. Dr. Pearson ran a series of tests and administered medication to control the seizures, and then he discharged Fomby. At approximately 1:50 p.m., Fomby *Page 241 
returned to the emergency room after having another seizure at work. Dr. Pearson ran more tests and administered additional medication. At about 5:15 p.m., Fomby was discharged from the hospital, accompanied by his mother. However, minutes later Fomby was rushed back into the emergency room after suffering yet another seizure in the hospital parking lot. As a result of this seizure, Fomby fell and sustained serious head injuries.
At trial, both parties presented expert testimony regarding whether Dr. Pearson had breached the standard of care. Fomby contended that Dr. Pearson had negligently caused his injuries by failing to admit him for observation and monitoring of his seizures and by failing to stabilize him before discharging him. Dr. Pearson denied these allegations, claiming that all aspects of his treatment complied with the standard of care for an emergency room physician. The jury began deliberating on the afternoon of October 26, 1995, but adjourned for the evening after failing to reach a verdict. On the morning of October 27, after about two hours of deliberation, the jury returned a verdict against Dr. Pearson, awarding $600,000 in damages.
The only issue on appeal is whether the trial court properly denied Pearson's motion for a new trial, which was based on allegations of juror misconduct. Pearson claimed that at least one juror, C.O., had improperly considered a dictionary definition of the word "standard" to resolve the key material issue whether Dr. Pearson had breached the "standard of care." Dr. Pearson alleged that C.O. had looked up the definition during the evening recess after the first day of deliberations and had informed the other jurors of his findings the following morning before the jury reached a verdict. In support of his motion, Dr. Pearson submitted the affidavit of juror S.P., which stated as follows:
 "My name is [S.P.] and I have personal knowledge of the facts stated in this Affidavit unless otherwise indicated. I served on the jury that decided a case brought on behalf of Fred Fomby against Dr. Pearson.
 "During the course of deliberations, there was a good bit of discussion about the meaning of the term 'standard of care.' Mr. [C.O.], one of the jurors, consulted Webster's Dictionary for the definition of the word 'standard' and informed the other jurors what he had found about the definition. Mr. [C.O.] stated that he considered this definition in arriving at a verdict in this case."
On February 20, 1996, 54 days after Dr. Pearson's motion for a new trial had been served and two days before it was to be heard, Fomby filed a memorandum in opposition to the motion. Attached were the affidavits of three other jurors, including that of C.O., the juror said to have consulted the dictionary. In substance, these three affidavits stated that the verdict had been based only upon the evidence and the court's instructions, and they denied that a dictionary had been used. Dr. Pearson moved to strike these three affidavits offered by Fomby as not timely under Rule 59(c), Ala. R. Civ. P. The trial court heard arguments on the motion for a new trial, but it did not take any additional testimony from any of the jurors. The trial court denied Dr. Pearson's motion for a new trial, but it did so without ever considering the motion to strike the three affidavits Fomby had offered. Rather, the court found that S.P.'s affidavit, even if uncontradicted, was insufficient to require a new trial because it failed to "conclusively prove" that the verdict was influenced by anything outside of the trial. Therefore, we consider whether S.P.'s affidavit, standing as undisputed evidence, required the trial court to grant Dr. Pearson's motion for a new trial. We agree with the trial court that the affidavit, in itself, did not require the trial court to grant Dr. Pearson's motion for a new trial. However, we conclude that the affidavit was sufficient to demonstrate that extraneous matters were before the jury during its deliberations and to suggest that indeed the verdict could have been influenced by jurors' exposure to the extraneous dictionary definition. Therefore, because of the uncertainties presented in this case, we reverse the judgment and remand the case for the trial court to determine the extent to which the extraneous matters might have actually influenced the verdict. *Page 242 
As a preliminary matter, we recognize that the final sentence of S.P.'s affidavit could constitute hearsay, which is not admissible in support of a motion for a new trial. SeeJefferson County v. Kellum 630 So.2d 426 (Ala. 1993). Although Fomby did raise the issue before the trial court, the judge did not rule on the admissibility of this statement, apparently assuming, without deciding, that it was admissible. Nor need we rule upon it, for, as we shall explain, even assuming C.O. did say that he "considered" the definition, and assuming S.P.'s statement is admissible, his statement is insufficient to show actual prejudice, and our remand for the trial judge to determine whether there had been any actual prejudice need only rely upon the preceding sentence in the affidavit, which states that C.O. consulted the dictionary for a definition and then informed the other jurors of what he had found.
In Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala. 1984), we examined the question of when juror misconduct requires the granting of a new trial, and there we stated the rule to be as follows:
 "Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law."
447 So.2d at 658 (overruling Jones v. McMonigal, 409 So.2d 1381
(Ala. 1982), to the extent Jones had excluded, as a ground for granting a new trial, extraneous matters from which prejudice may be presumed). "Consideration of the prejudicial effect of extraneous matter has been held to be 'a case-by-case determination to be made in light of the particular facts and attending circumstances.' " Fulton v. Callahan, 621 So.2d 1235,1249 (Ala. 1993), quoting Nowogorski v. Ford Motor Co.,579 So.2d 586, 590 (Ala. 1990).
Dr. Pearson argues that he was entitled to a new trial under the Whitten rule because, he argues, the affidavit showed that the juror misconduct affected the verdict, or, in the alternative, because the dictionary definition of the word "standard" constituted extraneous material that was prejudicial as a matter of law. We address each of these contentions in turn.
Dr. Pearson first claims that he is entitled to a new trial because the affidavit was sufficient to show that the exposure to the extraneous definition of "standard" resulted in actual prejudice that affected the verdict. We disagree. There is no evidence that any juror stated that he or she believed that the collective decision of the jury or the juror's individual decision was even influenced, let alone actually changed, by the exposure to the extraneous definition. We assume that the jurors were all exposed to the extraneous dictionary definition, because S.P. said C.O. shared it with them and said that C.O. said that he "considered" the definition, but these allegations do not necessarily imply that the exposure actually motivated the jury or any individual juror to decide in any particular way. Thus, actual prejudice was not shown.
However, Dr. Pearson argues that actual prejudice merely requires a showing that the verdict "could" have been affected, not that the juror misconduct necessarily determined the outcome. He points to two statements in prior decisions that, he argues, support this proposition. First, he cites Coots v.Isbell, 552 So.2d 139 (Ala. 1989), in which we stated, "In each of the cases in which we have held that the trial judge erred in failing to grant a new trial, there has been a common factor — the existence of juror misconduct that could have affected the verdict." 552 So.2d at 140. And second, he cites Fulton v.Callahan, 621 So.2d 1235 (Ala. 1993), in which this Court concluded that the juror misconduct actually affected the verdict and in which we stated that the inquiry was "whether the dictionary definitions could have influenced the decision-making of the jury, not whether the jury's consideration of the definitions necessarily determined the outcome." 621 So.2d at 1250. (Emphasis in original.) However, first it should be noted that the passage quoted from Coots is followed by a citation to Hallmark v. Allison, 451 So.2d 270
(Ala. 1984), a case in which prejudice was presumed because we were unable to determine whether the introduction of extraneous facts did change the decision of *Page 243 
the jurors. So our juror-misconduct cases encompass cases of both actual and presumed prejudice; that is, cases in which prejudice was actually shown by juror affidavits or testimony stating that the extraneous information had an affect upon the juror's verdict, and cases in which no juror so testified but because of the nature of the extraneous information the court presumed prejudice. And, second, when we framed the question inFulton as whether the extraneous matter "could have influenced the verdict," 621 So.2d at 1250, we did so in reference to a passage in Nowogorski v. Ford Motor Co., 579 So.2d 586
(Ala. 1990), which merely found that actual prejudice had been shown where a juror testified that his decision had been "influenced . . . to be 'more in favor' " of one party than the other. See Fulton, 621 So.2d at 1250. Therefore, when these statements are taken in context, it is clear that to show actual prejudice it is not necessary that a juror state that absent exposure to the extraneous material the jury verdict would have in fact been different. In short, actual prejudice has been shown where the introduction of the extraneous material had some influence upon the jury, but actual prejudice may not be inferred from the exposure itself. To hold otherwise would eradicate the distinction between actual and presumed prejudice.
Having decided that Dr. Pearson has not shown actual prejudice, we now discuss his second contention, that the dictionary definition of the word "standard" constitutes extraneous material that was prejudicial as a matter of law. Under the rule in Whitten, a new trial may be justified because members of the jury have been exposed to extraneous matters, even though there is no evidence showing that any juror's decision was actually changed as a result of the exposure. InHallmark v. Allison, 451 So.2d 270 (Ala. 1984), this Court held that a trial court had erred in overruling a motion for a new trial that was based on the fact that two jurors had taken unauthorized measurements of pick-up trucks after the first day of deliberations and had discussed and demonstrated their findings with other jurors. A single juror's affidavit, the only evidence of misconduct, stated that these measurements were " 'important in reaching [their] decision because it would be physically impossible for the boy to hit the windshield while standing straight up.' " 451 So.2d at 271. But there was no showing that any juror's decision was actually altered as a result of exposure to the extraneous matter. In reversing the judgment of the trial court, we concluded that the importance the jurors could have given the extraneous material in deciding a central issue in the case allowed prejudice to be presumed and that a new trial was required:
 "Although we are unable to determine whether the introduction of the extraneous facts did change the decision of the jurors, consideration of the extraneous facts was crucial in resolving a key material issue in the case, and we conclude that the trial court could not reasonably have found that the introduction of the extraneous facts into the jury's deliberations was not prejudicial."
451 So.2d at 271-72. (Emphasis added.)
Since Hallmark, this Court has discussed the rule that a new trial may be warranted where "consideration of the extraneous facts was crucial in resolving a 'key material issue in the case,' " in the context of cases where jurors consulted dictionary definitions to provide illumination on the trial judge's instructions. Nowogorski, 579 So.2d at 589, was a product liability case in which the Court held that the fact that several dictionary definitions were read aloud during jury deliberations required a new trial. We noted, "[T]he definition of the word 'defective' given to the jury was critical in determining a proper verdict." Id. at 589. Similarly, in Jordanv. Brantley, 589 So.2d 680 (Ala. 1991), juror affidavits explained that on the first day of deliberations the jury had unanimously agreed to render a verdict in favor of the plaintiffs against two defendants, but that the jurors had been divided as to whether one remaining defendant had been "reasonable" and "prudent" in her actions. After finding that jurors consulted dictionary definitions of those two words to resolve the question, the trial court granted a new trial. This Court affirmed. Most recently, in Fulton v. Callahan,621 So.2d 1235 (Ala. 1993), the Court held that it was reversible error to deny a motion for a new trial based on allegations of *Page 244 
juror misconduct. In Fulton, the jury assessed punitive damages; the judge had instructed the jury that punitive damages could be awarded only "where it is proven by clear and convincing evidence that the Defendant consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the Plaintiff." Id. at 1249 (emphasis inFulton). We held:
 "[T]he trial court could not have reasonably concluded that the jury's reference to dictionary definitions of 'oppression' and 'wantonness' was not prejudicial. These terms were material to a finding of the type of conduct necessary to support an award of punitive damages."
Id.
However, despite these analyses in Nowogorski Jordan, andFulton of the relationship between extraneous dictionary definitions and key material issues at trial, our holdings never presumed prejudice as a matter of law as a result of the exposure to the particular dictionary definitions. In each case we pointed to some showing of actual prejudice affecting the verdict. As noted previously, in Nowogorski we held that the evidence was sufficient to prove that the verdict was affected by juror misconduct because "at least one juror testified that his decision about the case was influenced by the extraneous dictionary definitions to be 'more in favor' of [the defendant] than in favor of the plaintiff." 579 So.2d at 590. Similarly, in Jordan "the foreperson told the trial judge that the dictionary definitions influenced the jury," and, therefore, we concluded, "[T]he trial court could not have found that the extraneous material was not prejudicial, because there was undisputed evidence that the extraneous material had influenced jurors." 589 So.2d at 682. And finally, in Fulton we noted that "[One juror's] affidavit states further that he believed that the definitions 'influenced [the jury] in [its] voting on the verdict.' " 621 So.2d at 1249. As a result, in that case we concluded that there had been a showing of actual prejudice and therefore explicitly did not reach the argument that the use of the definitions was prejudicial as a matter of law. Id.
While the reasoning of Hallmark and the aforementioned cases suggest that prejudice could be presumed from exposure to a dictionary or reference source definition that is crucial to resolving a key material issue in a particular case, a majority of this Court has never explicitly held this as such. Justice Jones, in his lead opinion in Nichols v. Seaboard CoastlineRy., 341 So.2d 671 (Ala. 1976), did conclude that one juror's presenting to others, during deliberations, encyclopedia definitions of the terms "negligence," "contributory negligence," "subsequent negligence," and "subsequent contributory negligence" and four other jurors' consulting an encyclopedia or dictionary to clear up confusion concerning several legal words and phrases constituted prejudice as a matter of law. Justice Jones reasoned that a new trial was required because the jury's consideration of the extraneous reference source definitions of the legal terms, regardless of their substantive accuracy as statements of law, encroached upon the exclusive right of the trial judge to instruct the jury on the law. See Nichols, 341 So.2d at 675-76. Justice Jones was careful to emphasize that his opinion was limited to the particular facts and circumstances of the case, but, even so, his opinion did not receive a majority of the votes of the Justices. Only one other Justice concurred with his opinion, and another concurred with his opinion, and another concurred in the result without explanation. Six Justices, in a special writing, adhered to the traditional rule, overruled in Whitten, that actual prejudice had to be shown, although they concurred in the result of Justice Jones's opinion, because they concluded that a satisfactory showing of actual prejudice had been made under the facts of the case. See Nichols, at 677 (Bloodworth, J., concurring specially "in the result to reverse and remand").
However, even assuming that Justice Jones's opinion inNichols had represented the majority view, that would not necessarily dictate a result in this case in favor of Dr. Pearson. Nichols involved reference source definitions of a number of words and phrases that were unarguably terms of art, with specific legal meanings. In this case we are unwilling to conclude that the jury's mere unauthorized exposure to the definition of the single word "standard" automatically requires *Page 245 
a new trial as a matter of law. The word "standard" clearly related to a key material issue in the case, specifically, whether Dr. Pearson's treatment had breached the "standard of care." In order to prevail on his medical malpractice claim, Fomby was required to show that Dr. Pearson's treatment breached the "standard of care." See Levesque v. RegionalMedical Center Bd, 612 So.2d 445, 448 (Ala. 1993); Hannon v.Duncan, 594 So.2d 85, 89 (Ala. 1992); Bradford v. McGee,534 So.2d 1076, 1079 (Ala. 1988); §§ 6-5-484, 6-5-548, Ala. Code 1975. And the phrase "standard of care," as used here, is a term of art with a specific legal definition that is set out in § 6-5-542(2), Ala. Code 1975:
 "(2) STANDARD OF CARE. The standard of care is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases."
However, we do not believe that the dictionary definition of a portion of the term "standard of care" was necessarily so"crucial to the resolution" of that key material issue that the exposure alone mandates a new trial. See Hallmark, supra, 451 So.2d at 271. Nor are we convinced that consulting the dictionary for a definition of the single word usurped the trial judge's exclusive right to instruct the jury on the law. See Nichols, supra. We do not wish to be understood to mean that a juror's consulting a dictionary for a definition, even of a single word in the judge's charge, can never constitute prejudice as a matter of law. Today, we merely hold that, given the character of this particular nonlegal word, and considering the facts and circumstances of this case, the juror's consulting the dictionary does not require a new trial, absent a showing of some actual prejudice.
However, despite our holding that mere exposure to the definition does not require a new trial as a matter of law, we do believe that Dr. Pearson made a sufficient showing that the jury did consider extraneous material that was related to a key material issue at trial. The undisputed evidence shows the following: that the jury was unable to reach a verdict on the first day of deliberations; that one juror looked up the dictionary definition of the word "standard" and shared his findings with the others before the jury reached a verdict; and that the word looked up, the word "standard," did clearly relate to a key material issue in the case. This evidence was sufficient to strongly suggest that the jury had been exposed to extraneous matter that could have affected the verdict in this case. Given this showing, we remand this case for the trial judge to determine, after taking such evidence as he deems appropriate, whether there had been actual prejudice. Although it does not appear that we have heretofore required a trial judge to solicit additional testimony in this context, such post-trial hearings are not unprecedented when it is clear that jurors might have considered extraneous matter. See, e.g.,Coots v. Isbell, 552 So.2d at 141. In conclusion, we hold that, under the facts and circumstances of this case, Juror S.P.'s affidavit was insufficient to show actual prejudice that affected the verdict, given that there is no evidence that even one juror admitted that his or her vote was changed or even influenced as a result of the exposure to the definition. Similarly, we find ourselves unable to conclude that S.P.'s affidavit demonstrated that the exposure to the single dictionary definition, even though relating to a key material issue in the case, was so "crucial" to the determination of that issue that it constituted prejudice as a matter of law that would require a new trial. However, we hold that the S.P.'s affidavit, as undisputed evidence, was sufficient to strongly suggest that the jury had been exposed to extraneous matter that could have affected the verdict in this case. Therefore, the judgment is reversed and the case is remanded for the trial court to hold proceedings to determine the extent, if any, to which the exposure to the extraneous dictionary definition might have actually influenced the verdict. The court is then to reconsider the verdict in light of that determination.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, KENNEDY, and COOK, JJ., concur. *Page 246