621 So.2d 1235 (1993)
Thomas W. FULTON, et al.
v.
H.L. CALLAHAN.
1910611.
Supreme Court of Alabama.
April 16, 1993.
Rehearing Denied June 4, 1993.
*1237 Brock B. Gordon, E. Watson Smith and Alan C. Christian of Johnstone, Adams, Bailey, Gordon and Harris, Mobile, for appellants.
Jerry A. McDowell and David R. Quittmeyer of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for appellee.
ALMON, Justice.
The individual defendants, majority shareholders and directors of The Finch Companies, Inc. ("the corporation"), appeal from a judgment awarding the plaintiff, H.L. "Sonny" Callahan, a minority shareholder and director, $3,927,500 in compensatory and punitive damages and appointing a receiver and a new board of directors. The defendants were the corporation and the appellants Thomas W. Fulton, Daniel R. Fulton, Samuel C. Fulton, and Elizabeth J. ("Betty Jo") Fulton. Betty Jo is the daughter of Thomas W. Finch, founder of the warehousing and transfer business that became The Finch Companies, Inc., in 1985. She is the wife of Samuel C. Fulton; Thomas W. Fulton and Daniel R. Fulton are their two sons. Sonny Callahan and Betty Jo Fulton are first cousins.
All of the Fultons are members of the board of directors of the corporation. Together they own 51% of the outstanding shares. Sonny Callahan and his son Scott Callahan are both directors; together they own 49% of the shares.[1]
*1238 Callahan brought an action for compensatory and punitive damages, alleging negligent and wanton breach of fiduciary duty and conspiracy to commit these alleged wrongs. Callahan also sought compensatory and punitive damages for intentional depreciation of the company's stock in violation of § 10-2A-71, Alabama Code 1975. In addition, Callahan sought an injunction, a declaratory judgment, an accounting concerning Callahan's "advance account," and the appointment of a receiver pursuant to § 10-2A-195, Alabama Code 1975. The corporation counterclaimed, alleging that Callahan was liable to the corporation for the unpaid amount of $399,650.50 on an advance account.[2]
The jury returned a verdict in favor of Callahan, awarding him $2,927,500 in compensatory damages and $1,000,000 in punitive damages. After entering a judgment on the verdict, the trial court considered Callahan's equitable claims. After adopting the jury's advisory findings that the Fultons' conduct had been oppressive and that the Fultons had misapplied and wasted the corporate assets and after making its own finding of a breakdown of the corporate "entente cordiale,"[3] the trial court held that Callahan was entitled to equitable relief. The trial court removed the existing board of directors, appointed a receiver and a new board of directors to manage the corporation, and ordered the new board to submit a plan of liquidation.

ISSUES
The Fultons raise a number of issues on appeal, including whether the evidence was sufficient to support a claim of intentional stock depreciation as defined in § 10-2A-71, whether the court erred in denying the motion for new trial on the ground of juror misconduct, and whether the court properly awarded equitable relief.

FACTS
This litigation stems from a dispute between majority and minority shareholders of a closely held family corporation. Because sufficiency of the evidence is at issue, a detailed factual statement is necessary.
The Mobile warehousing and moving business that became The Finch Companies, Inc., was founded as a proprietorship in 1933 by Thomas W. Finch. Thomas W. Finch was Betty Jo's father and Callahan's uncle. In 1957 Mr. Finch incorporated his business, forming two corporations: Finch Realty Company and Finch Warehouse and Transfer Company, Inc. The former owned the real estate; the latter operated the business. When Callahan was 13 years old, he came to live with Thomas W. Finch and his wife, who reared him as a son. Thus, although they were cousins, the relationship of Callahan and Betty Jo was more like that of brother and sister. As they were growing up, both Betty Jo and Callahan worked in the family business. After graduating from high school and spending two years in the United States Navy, Callahan returned and began working in the business as a dispatcher.
In 1964 Mr. Finch died. Callahan, who at the time of Mr. Finch's death was assistant vice president, became president and *1239 chief executive officer of both corporations. During Callahan's presidency the business was successful and grew. Operations expanded to Montgomery and Birmingham. Between 1964 and 1985, five new warehouses were built or acquired, increasing the amount of warehousing space used in the business from 50,000 square feet to 650,000 square feet. Callahan also formed two new corporations: Great Southern Corporation and Furniture Leasing Concepts, Inc.
During these years, Callahan and the Fultons established two practices. First was the annual distribution of substantially all the earnings and profits of the business. Because the shareholders were also employees, these distributions took the form of salaries and bonuses. The purpose of this arrangement was to avoid the disadvantageous tax consequences of distributing the earnings and profits of the business to the shareholders in the form of dividends. Second was the practice of maintaining "advance accounts" for directors and officers. Before 1985, Callahan, Betty Jo, Mrs. Finch, and Samuel Fulton (Betty Jo's husband) each maintained draw or advance accounts. These accounts allowed them to withdraw money during the year. At the end of the year, the accounts would be credited with whatever bonuses were declared. If such bonuses were insufficient to cover the advance account, then the negative balance was carried over to the next year.
In 1984 Callahan was elected to the United States House of Representatives. Because of strict limits on outside earned income imposed by ethics rules of the House of Representatives, Callahan proposed that the business reorganize and become a Subchapter S Corporation. The Fultons agreed, and four corporations (Finch Realty Corporation, Finch Warehousing and Transfer Company, Inc., Great Southern Corporation, and Furniture Leasing Concepts, Inc.) were consolidated into one corporation called The Finch Companies, Inc. The Callahans and the Fultons elected to make the new corporation a Subchapter S corporation. Unlike a Subchapter C corporation, corporate earnings in an S-corporation pass through and are taxed directly to the shareholders at individual rates. Shareholders of an S-Corporation are taxed on their proportionate shares of the corporation's earnings, regardless of whether the directors declare any dividends. Thus, under this new arrangement Callahan would receive unearned income from the business in the form of dividends taxed to him but not to the corporation.
As part of an agreement between the Callahans and the Fultons, Callahan stepped down, and Betty Jo's son Thomas W. Fulton ("Thomas") became president of the newly consolidated corporation. The parties agreed that the Fultons would hold a 51% majority of all the shares of the corporation and that the Callahans would hold 49%. The Fultons and the Callahans also agreed to require Callahan's approval for any capital expenditure in excess of $5,000. Other aspects of the agreement, however, were disputed at trial. Callahan testified that he and Betty Jo orally agreed that each year all the earnings and profits of the corporation would be distributed as dividends to the shareholders. Betty Jo denied any such agreement. Undisputed, however, was testimony showing that all of the corporation's profits for 1985, 1986, and 1987 were distributed automatically without formal action on the part of the board of directors.
During the first three years that followed the consolidation, relations between Callahan and the Fultons were generally amicable. These were the most profitable years the business had ever known. In a January 1988 board meeting, Thomas proposed that the business expand from warehousing and local drayage into long-haul freight. After reviewing earnings projections prepared and presented by Thomas at the February 1988 meeting, the board unanimously approved the plan. Based on his own investigation and consultation with others in the long-haul freight business, Thomas estimated that with five tractors and eight trailers, the trucking division would generate first-year earnings of $37,599. Although initially opposed to the idea, *1240 Callahan voted in favor of the proposal after receiving assurances from Thomas that losses would not exceed $50,000. Thomas also agreed in January 1988 that if the venture did not succeed, he would shut it down.
After the decision in 1988 to enter the long-haul freight business, relations between Callahan and the Fultons began to deteriorate, along with the financial strength of the business. Losses from the trucking division mounted. Callahan continued his practice of taking large withdrawals on his advance account, and Callahan and the Fultons initiated difficult negotiations for the buy-out of Callahan's shares.
Contrary to Thomas's projections, the plan to enter the long-haul freight business turned out disastrously. From the beginning, the trucking division suffered heavy losses. By April 1989, after 10 months of operation, the trucking division had lost $77,449. Notwithstanding such losses, in 1989 Thomas leased 20 more trucks and additional trailers.
By the end of 1989 the trucking division had lost $300,000. In a business plan prepared by Thomas and presented to the board in February 1990, Thomas projected, based on 1989 information, that the trucking division would have net profits of $88,612 in 1990, $148,000 in 1991, and $213,000 in 1992. The division, however, lost approximately $300,000 in 1990. At trial, Thomas testified that he expected the division to lose around the same amount in 1991. By September 1991, after roughly three years of operation, cumulative losses from the trucking division had reached $950,000.
In the February 1990 board meeting, Callahan pleaded with the Fultons to get out of the trucking business. The Fultons considered a plan to shut down the division by buying out the leases and selling the equipment. The corporation had acquired its trucks under leases having terms generally between four and five years. When Thomas negotiated these leases, however, he did not include any contractual way of getting out of them before their terms had expired. Thus, when faced with persistent losses, the corporation could not shut the trucking division down without buying out the leases and selling trucks. Because the market was at that time glutted with trucking equipment, Thomas estimated, in a report to the board in 1990, that if the corporation bought out the leases on the trucks and sold them, it would sustain a loss of $300,000.[4] Later that year, in an internal business plan, it was estimated that as of October 30, 1990, it would cost $700,000 to buy out the leases. In the judgment of the Fultons, however, it was better to try to conduct the trucking business at a profit, or at least at lower levels of loss, until the lease terms expired than to try to sell the trucks and trailers at such a loss in an equipment-laden market. At the February 1990 board meeting, Callahan made a motion to look for means to separate the trucking division from the corporation. Asserting that this proposal was impracticable, the Fultons voted it down.
After the 1985 consolidation, Callahan began making large withdrawals from his advance account. In July 1985, immediately after the consolidation, Callahan's draw account had a negative balance of $144,381. Callahan withdrew $49,776.12 in 1985 and $156,155.52 in 1986. Callahan's share of net earnings, however, was only $15,496.41 in 1985 and $72,690.00 in 1986. Thus, although Callahan's share of distributed earnings was credited each year to his advance account, the deficit increased. The Fultons thought the withdrawals were excessive and told Callahan that they could not continue. At the January 1988 meeting of the board of directors, the Fultons informed Callahan that he would have to *1241 limit his withdrawals to $10,000 per month. Callahan, however, withdrew $214,290 in 1988. His share of distributed earnings for the year was $188,175. This practice continued, and when this action was filed, the negative balance in Callahan's advance account had reached $416,939.
When the Fultons informed Callahan at the January 1988 meeting that he would have to limit his draws to $10,000 a month, Callahan told them that he wanted to be bought out. Shortly after this meeting, Thomas sent a letter to one of the corporation's attorneys authorizing him to represent Callahan in the buy-out negotiations. Against the background of escalating losses in the trucking division and increasing financial difficulty, there followed a series of offers and counteroffers in which the principal dispute was the value of Callahan's shares.
In April 1988, Callahan proposed that the two families value Callahan's shares at $3,662,753. Callahan based this estimate on the average of two sums arrived at by employing a capitalized income valuation approach and a net asset value valuation approach. In July 1988 Thomas responded with a valuation of $620,605 and a net cash offer of approximately $600,000, representing $1,000,000 less the deficit balance in Callahan's advance account. The Fultons arrived at their valuation by averaging the net income of the three most profitable years the corporation had ever known (a $101,000-per-year average) and calculating the present value of a stream of such income over a 10-year period. The Fultons thus calculated Callahan's shares to be worth about $620,605. In making their net cash offer, they then increased this figure to $1,000,000. Callahan did not accept, and Thomas withdrew the offer in August 1988.
At the January 1989 board meeting, Callahan and the Fultons disputed whether corporate income, upon which Callahan had paid income taxes, was his personal property before the actual declaration of a dividend. Until the parties could obtain legal advice, action was postponed until May 1989. It was subsequently determined that no shareholder was entitled to S-corporation earnings and profits until the board declared a dividend.
At the May 1989 meeting, over Callahan's objection, the Fultons voted to distribute 100% of the proceeds from the recent sale of a capital asset, but only 50% of the corporation's earnings. This decision was made retroactive to 1988. In addition, the Fultons voted to require that dividends be applied to outstanding balances on advance accounts and to allow advances in the future only for the purpose of paying taxes on corporate income. However, the board did approve an $80,000 loan to Callahan for the first five months of 1989. Because of the large deficit in Callahan's advance account, the effect of these decisions after 1989 was to prohibit Callahan from receiving any more dividend distributions or taking any more advances, other than those necessary to pay taxes. The Fultons also voted to charge Callahan interest on the outstanding balance of his advance account.
At the May 1989 meeting Callahan learned that, without formal board approval, the corporation had obtained a bank loan of $57,000 and had signed a lease costing $646,260. Thomas and Betty Jo had signed and delivered resolutions stating that at a meeting the board had approved the loan and lease in question, even though no such meeting ever took place. On cross-examination, however, Callahan admitted that during his presidency, he and Betty Jo routinely signed such resolutions authorizing various corporate actions notwithstanding the absence of formal board approval. Over Callahan's objection at the May 1989 meeting, the board authorized Thomas to borrow an amount not to exceed $100,000 and authorized Thomas and Betty Jo to borrow sums exceeding $100,000.
At the May 1989 board meeting, Callahan also became aware of an investment account opened by Thomas for surplus corporate funds. As with other transactions during this period, the Fultons established the account after submitting to Morgan Keegan & Company, Inc., a resolution signed by Thomas and Betty Jo stating *1242 that at a meeting the board had authorized the establishment of the account. No such authorization at a meeting, however, had been given. Over the life of the account Thomas invested $165,982 in corporate funds, for a total loss of $70. Some of the investments were made on a margin, which at times equalled $121,732. At trial Callahan introduced expert testimony indicating that it was very unusual for a corporation to make investments of corporate surplus on margin.
After the May 1989 board meeting, the buy-out negotiations continued. In September 1989 Callahan proposed that the parties avoid all the wrangling over valuation and simply divide the assets of the corporation. The Fultons, however, viewing the corporation as a single entity, refused to consider at that time the splitting up of the business. Convinced that his shares were worth $3,800,000, Callahan proposed in October 1989 a sale price of $2,900,000 or $593 per share, to be paid over 10 years.[5] The Fultons rejected the offer as not "in the ballpark" and suggested that their July 1988 offer price of $204.50 per share was more reasonable. In November 1989, to help the parties arrive at a fair price, Callahan renewed an earlier proposal that the parties consider any offer price to be a figure at which the offeror would be willing to sell. With this suggestion, Callahan offered to sell his shares for $2.9 million or, in the alternative, to buy the Fultons' stock for $3.8 million. The Fultons responded by stating, vehemently, that their stock was not for sale at any price.
At this point in the negotiations, the Fultons hired the accounting firm Ernst & Young to appraise Callahan's minority share of the corporation for purposes of a buy-out. Betty Jo had originally commissioned Ernst & Young to determine the fair market value of the corporation for gift and estate tax planning purposes because Callahan and the Fultons had failed to reach an agreement after more than a year of negotiations. Since 1986, Betty Jo, who then owned 47.2% of the outstanding shares, had been anxious about emptying her estate of the stock and transferring it by gift to her sons Thomas and Daniel Fulton and their wives.[6] The Fultons, however, apparently changed the stated purpose of the Ernst & Young appraisal from valuing Betty Jo's shares for estate planning purposes to valuing Callahan's minority interest.
The Ernst & Young report valued a 100% controlling interest in the corporation at $2 million, and, after applying minority and marketability discounts, appraised Callahan's 48.9% minority interest at $626,000. Ernst & Young reached the $2 million figure by averaging valuations derived from an income capitalization approach and from a market or comparative company approach. Ernst & Young stated that it declined to employ a cost or net asset value approach to valuation because, it said, such an approach failed to take into account the corporation as a going concern and failed to properly consider its future earnings potential.
At trial, Callahan disputed the valuation of the Ernst & Young appraisal. Over the Fultons' objection, Callahan introduced testimony from real estate appraisers indicating that of the seven warehouses owned by the corporation, five were worth $6.9 million and the remaining two were worth $1,784,000. Based upon the liabilities shown on the corporation's financial statements, Callahan's counsel proposed to the jury, in closing argument, that the net asset value of the corporation was $6,825,000 and that Callahan's 48.9% interest had a value of $3,344,440.
Based on the Ernst & Young appraisal, Thomas sent a letter, dated December 20, 1989, offering Callahan $1 million for his stock in the corporation. In the letter *1243 Thomas explained that the Ernst & Young appraisal had been commissioned to value Callahan's shares for possible buy-out and that this valuation would also serve to establish the value of Betty Jo's stock for purposes of her gift and estate planning. The letter cautioned Callahan that once Betty Jo began giving her stock to her sons and their wives at a share value based on the appraisal, the Fultons would be unable to alter substantially their $1 million offer:
"It is important to know also that, when a price is paid for stock, any estimated valuation, no matter how well defined, automatically becomes the `fair market value.' Should Mom [Betty Jo] begin gifting stock to Danny [Daniel Fulton] & I [Thomas], at the value determined through the analysis of Ernst & Young, for example, any substantially different price paid within three years of the last gifting, changes the value of those gifts, and subjects Mom to tax on the difference."
In December 1990 and January 1991, with no buy-out agreement imminent, Betty Jo made transfers of her stock to her sons and daughters-in-law.[7] Her goal in these gift transactions was to take advantage of the federal annual gift tax exclusions. On advice from Ernst & Young, Betty Jo stated the value of the transferred stock at $79.82 per share. Betty Jo admitted at trial that by doing so she impliedly represented that the entire corporation was worth only $800,000.
At trial and on appeal, Callahan and the Fultons have disputed the relationship between Betty Jo's estate planning, the Ernst & Young appraisal, and the buy-out negotiations. The Fultons have asserted that they commissioned the accounting firm to appraise Callahan's shares for the dual purpose of breaking the impasse in the negotiations and arriving at a realistic valuation that would satisfy Callahan and the Internal Revenue Service. At trial, however, Callahan tried to show that the Fultons unfairly devalued his stock in an effort to buy him out at less than fair value and to assist Betty Jo with her estate planning. According to Callahan, Betty Jo wanted to convey her stock and voting power to her sons, but had to limit its value in order to avoid adverse gift and estate tax consequences. Thus, according to Callahan, the purchase value of Callahan's shares was unfairly tied to and limited by the Ernst & Young appraisal and requirements of Betty Jo's estate planning.
In February 1990, the board of directors met again. As in 1989, the board declared a dividend of 50% of earnings and profits and required that all dividends be applied first to outstanding negative balances on advance accounts. As in the year before, advances were permitted to pay tax liabilities arising from quarterly corporate profits. Over Callahan's strenuous objection, the Fultons voted to increase Thomas's salary, as president of the company, by $20,000. Callahan moved for, but the board failed to pass, a resolution to increase Patrick Callahan's salary by the same percentage as Thomas and Daniel Fulton's salaries. The board, however, voted to allow Callahan's other son Patrick to receive some bonus commissions that the board had provided for Daniel Fulton and voted to continue Scott Callahan's salary of $40,000 while he was on leave of absence working for a realty company in the Mobile area, in anticipation of later doing realty work for The Finch Companies. It was also during this meeting that the Fultons voted down a resolution, introduced by Callahan, to look for means to separate the trucking division from the corporation.
Around the time of the February 1990 meeting, the corporation was experiencing financial difficulty due to the combined effect of the heavy losses suffered by the trucking division and Callahan's large advance account withdrawals.[8] On February *1244 6, 1990, First Alabama Bank wrote Thomas to complain about "past due" loans and to request that the corporation bring them current. Because of its cash flow problems, the corporation was also threatened by overdrafts. In May 1990, another of the corporation's creditors, AmSouth Bank, denied an application for a $100,000 loan to put a new roof on one of the warehouses. Later, in June 1990, AmSouth complained about past due loans and asked the corporation to submit a plan for repayment.
Meanwhile, buy-out negotiations continued, and in September 1990 Thomas proposed a $1,600,000 cash-and-notes plan ($327.20/share). In return for Callahan's stock and payment of his $380,000 debt to the corporation, Thomas and his brother Daniel would borrow $1,000,000 and give Callahan $1,000,000 cash down and a $600,000 note payable in seven years with interest. Because of the corporation's cash flow problems and the consequent difficulty in servicing $1,000,000 more in debt, the September 1990 proposal evolved into a plan to split off part of the corporation to Callahan. This plan involved the tax-free split-off of one of the warehouses to a new corporation formed by Callahan and the transfer to this new corporation of certain accounts, sundry warehousing equipment, a non-interest bearing note for $250,000, and a $750,000 cash payment for working capital. By mid-October 1990, Callahan and the Fultons had reached an agreement in principle under these terms. The agreement, however, was contingent on the Fultons' obtaining long-term mortgage financing in the amount of $1,350,000. Because of the corporation's poor earnings performance and general financial weakness, the Fultons were unable to secure the necessary financing.
Despite a net operating loss of $146,108, the corporation managed to make a small profit of $5,101 in 1990. At its February 1991 meeting, the board voted, over Callahan's strong opposition, to declare no dividends for 1990. Also over Callahan's objection, the board passed resolutions prohibiting new advances to officers or shareholders in 1991 and discontinuing Callahan's $1,000 per month director's fee. Unlike in 1990, the board did not advance money to pay tax liabilities. As a result, Callahan had to pay, from other sources of income, taxes on income recognized by the corporation due to interest charged on the deficit balance of Callahan's advance account.
On April 10, 1991, Callahan filed this action.
At the conclusion of the trial, the judge submitted to the jury a special verdict form and two special interrogatories for the purpose of making advisory findings. The special verdict form included four causes of action: (1) A derivative claim on behalf of the corporation alleging waste and mismanagement, (2) A claim alleging wanton breach of a fiduciary duty of care, brought individually by Callahan and derivatively on behalf of the corporation, (3) An individual claim alleging intentional depreciation of Callahan's stock, brought pursuant to *1245 § 10-2A-71, Ala.Code 1975,[9] and (4) An individual claim alleging conspiracy to commit these alleged wrongs. On the derivative claim of waste and mismanagement, brought by Callahan on behalf of the corporation, the jury found for the plaintiff corporation, but awarded no damages. On the corporation's and Callahan's claim of wantonness and on Callahan's claim for conspiracy, the jury found for the Fultons. On Callahan's statutory claim of intentional devaluation of his stock, the jury found for Callahan against the Fultons and awarded him $2,927,500 in compensatory damages. The jury also assessed punitive damages of $1,000,000 against the Fultons. To decide the corporations' counterclaim regarding Callahan's "advance account," the trial judge submitted a special verdict question, and the jury returned a special finding that the parties had agreed that the account would be paid only out of future corporate earnings. By special interrogatory, the jury also made two advisory findings: (1) that the acts of the defendants had been oppressive and (2) that the defendants had misapplied or wasted the assets of the corporation.
After entering a $3,927,500 judgment for Callahan, the trial judge considered the equitable claims. The trial judge adopted the jury's advisory findings and after making his own additional finding that there had been a breakdown of the corporate "entente cordiale," the trial judge held that Callahan was entitled to equitable relief. In his initial November 1991 order, the judge removed the existing directors and appointed a new board consisting of a receiver/trustee, a director appointed by the court, two directors named by Callahan, and an additional director appointed by the receiver/trustee. Although retaining the power to do so, the trial judge did not provide for the immediate dissolution and liquidation of the corporation. On the contrary, the initial order granted the receiver/trustee and new board broad powers to conduct the business as a going concern. In December 1991, the trial court amended its November 1991 order, increasing the number of directors from five to seven and allowing the Fultons to appoint two directors to the new board. In January 1992, the trial judge ordered the directors to present to the court a plan to liquidate the corporation.
In November 1991, the Fultons filed a post-trial motion requesting the trial court to enter a judgment notwithstanding the verdict or a new trial, or to alter, amend, or vacate the judgment; or, in the alternative, to order a remittitur. The Fultons also moved to stay the trial court's equitable order. Presented with these motions were affidavits from two jurors describing use of dictionaries during the deliberations. After reviewing the parties' briefs and hearing oral argument, the trial judge denied the Fultons' post-trial motion in all respects.

I.
The first issue is whether the evidence introduced at trial was sufficient to sustain Callahan's claim under § 10-2A-71, Ala. Code 1975, alleging intentional devaluation of his stock by the Fultons.
Section 10-2A-71, Ala.Code 1975, states:
"No president, director or managing officer of any corporation ... shall do or omit to do any act, or shall make any declaration or statement in writing, or otherwise, with the intent to depreciate the market value of the stock or bonds of such corporation, and with the further intent to enable such president, director or other managing officer, or any other person, to buy any such stock or bonds at less than the real value thereof."
This statute specifically proscribes unfair stock dealings by directors and officers. Alabama Code 1975, § 10-2A-71, commentary. A cause of action under this statute includes the following elements: (1) A defendant who is a president, director, or managing officer, irrespective of title, (2) An act or a declaration or statement, in writing or otherwise, (3) Intent to depreciate *1246 the value of the corporation's stock or bonds, with the further intent to enable the director or officer defendant, or another person, to buy the corporation's stock or bonds at less than their real value, and (4) damage. The measure of damages is the difference between the real and the depreciated value of the stock at the time the defendant perpetrates the wrongfully depreciating act. Belcher v. Birmingham Trust Nat'l Bank, 348 F.Supp. 61, 147 (N.D.Ala.1968), stay denied, 395 F.2d 685 (5th Cir.1968).
The trial court denied the defendants' motions for directed verdict and judgment notwithstanding the verdict, on the issue of the sufficiency of the evidence to support Callahan's stock devaluation claim. On appeal, the Fultons make three arguments to demonstrate that Callahan failed to prove a claim under § 10-2A-71. First, they argue that the statute provides only for "an equitable remedy to reverse a sale of stock." Second, they argue that because Callahan suffered no loss on a sale of stock that was proximately caused by unfair insider dealing, they are not liable. Third, they contend that because Callahan was aware of all the facts relevant to any valuation of the corporation and its stock, Callahan has failed to prove a claim under § 10-2A-71.
Although this Court has never construed this statute, a federal district court sitting in Alabama applied a predecessor to this provision in Belcher v. Birmingham Trust Nat'l Bank, 348 F.Supp. 61 (N.D.Ala.1968) (applying Code of Ala.1940, Tit. 10, § 92), stay denied, 395 F.2d 685 (5th Cir.1968). Although the earlier statute, Tit. 10, § 92, Code of Ala. 1940, was a criminal provision, the language of the former statute and the present one are almost identical. Compare Ala.Code 1975, § 10-2A-71, with Ala.Code 1940, Tit. 10, § 92. In Belcher, the district court construed Tit. 10, § 92, to imply a civil cause of action for violation of the statute. Belcher, 348 F.Supp. at 146. The court held several majority-shareholder directors and officers liable for concealing and failing to divulge the value of timber lands owned by the corporation with the intent of buying another shareholder's shares at less than their real value. Belcher, 348 F.Supp. at 147. The Belcher court viewed the majority-shareholder directors and officers' purchase offers as impliedly representing that the prices offered for the minority shareholders' stock reflected its fair value. See Belcher, 348 F.Supp. at 138, n. 11; see id. at 143-47. The key factor in Belcher was that the defendants "knew the [true] underlying values." Id., at 147.
The Fultons' first argument, that § 10-2A-71 provides only for an equitable remedy, is without merit. Neither the language and purpose of the statute nor the district court's opinion in Belcher supports this construction. Equally without merit is the Fultons' second argument that to recover damages under § 10-2A-71 a plaintiff must have suffered a loss on a sale of stock, which loss was proximately caused by the defendant's act or statement made to devalue the stock. The language of § 10-2A-71 requires only that the defendant act or make a statement with the intent to devalue the stock "with the further intent to enable such president, director or other managing officer, or any other person, to buy such stock or bonds at less than the real value thereof." Ala.Code 1975, § 10-2A-71 (emphasis added); Belcher, 348 F.Supp. at 146-47. It is unnecessary to prove that the defendant purchased the stock; a plaintiff need only prove that the defendant intentionally acted to devalue the stock with the intent to be able to buy the stock at less than its real value.
Third, the Fultons argue that Callahan failed to prove a claim because, they say, he was fully aware of the facts relevant to any valuation of his stock. The Fultons' argument mischaracterizes the nature of the wrong that the statute proscribes. The Fultons' argument impliedly analogizes to an action for fraud and assumes thereby that some type of reliance on the part of the plaintiff is required.
Section 10-2A-71 provides that directors and managing officers owe a duty not to engage in unfair insider dealings for the purpose of buying shareholder stock at less than real value. The statute constitutes a *1247 more specific statutory expression of the general fiduciary duty owed by directors and officers to shareholders under other provisions of the Alabama Business Corporation Act. See Ala.Code 1975, § 10-2A-76 (fiduciary duties of directors); § 10-2A-74 (director's general duty of care). As in an action alleging breach of fiduciary duty, the only relevant facts under § 10-2A-71, for purposes of sufficiency, are the defendant's intent and conduct and the damage incurred by the plaintiff. Thus, even if substantial evidence existed from which a jury could reasonably find that Callahan was indeed aware of all the facts relevant to the value of his stock, he could still recover if the defendants' conduct was otherwise actionable.
More generally, the Fultons argue that the evidence is insufficient to sustain a claim of devaluation with an intent to buy at less than real value. The standard of review is whether the nonmoving party has produced substantial evidence to support its claim. Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38 (Ala.1990); Ex parte Oliver, 532 So.2d 627 (Ala.1988); see also Ala.Code 1975, § 12-21-12. In determining the propriety of a directed verdict or judgment notwithstanding the verdict, this Court "must review the entire evidence and indulge every reasonable inference in favor of the nonmoving party." Northeast Alabama Regional Medical Ctr. v. Owens, 584 So.2d 1360, 1365 (Ala.1991). After carefully reviewing the record in the light most favorable to Callahan, this Court concludes that Callahan presented substantial evidence from which a reasonable jury could infer that the Fultons had intentionally devalued the corporation's stock with the intent of buying Callahan's stock at less than its real value.
Callahan's evidence of the relationship between Betty Jo's estate planning and the buy-out negotiations with Callahan constituted substantial evidence from which a jury could reasonably infer that the Fultons intended to tie the buy-out price to Betty Jo's estate planning, enabling them thereby to buy out Callahan at less than fair value and allowing Betty Jo to transfer more stock without gift tax consequences. Both Thomas's December 20, 1989, letter to Callahan informing him that the Fultons would be unable to substantially raise their $1 million offer after Betty Jo began "gifting" her shares and the relatively low $79.82 per share value Betty Jo used when reporting her 1989 and 1990 gifts of stock constitute substantial evidence that the Fultons had depreciated Callahan's stock with the intent to buy it for less than its real value. Moreover, the inference of unfair insider dealing is strengthened by the facts that after the May 1989 meeting Callahan was effectively unable to receive any more income from the corporation and that the Fultons were really the only market for Callahan's stock.
In our disposition of this issue, we emphasize the special considerations presented by the fact that Callahan was a minority shareholder in a closely held corporation. Callahan's position in the circumstances of this case illustrates the unique vulnerability of minority shareholders in closely held corporations, especially in buy-out negotiations, when often there is no real market for their shares. Because of the limited marketability of their shares and the right of the majority shareholders to control corporate decision-making in closely held corporations, minority shareholders are restricted in their ability to realize the value of their investment, whether it be in the form of salary, dividends, or proceeds from a sale of their stock. Callahan depended, as minority shareholders generally do, on the Fultons' treating him fairly.

II.
The second issue for our consideration is whether the trial court erred in denying the Fultons' motion for new trial based on allegations of juror misconduct. Submitted with the Fultons' post-trial motion for new trial were three juror affidavits stating, among other things, that the jury foreperson brought a pocket dictionary into the jury deliberations and consulted it to determine the meaning of key terms in the trial judge's oral charge.
*1248 The threshold question here is whether, under the facts of this case, this Court will consider juror affidavits for the purpose of impeaching the jury's verdict. "The general rule in Alabama, as well as in a majority of jurisdictions, is that affidavits of jurors will not be accepted for the purpose of impeaching their own verdict." Weekley v. Horn, 263 Ala. 364, 365, 82 So.2d 341 (1955); see also Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala.1984); Allman v. Beam, 272 Ala. 110, 130 So.2d 194 (1961). "This general rule is subject to an exception which arises when the affidavits tend to show extraneous facts which have influenced the verdict." Whitten, 447 So.2d at 657; see also Allman, 272 Ala. at 115, 130 So.2d at 198; Weekley, 263 Ala. at 366, 82 So.2d at 342; Leith v. State, 206 Ala. 439, 90 So. 687 (1921). Thus, the exception has two components: (1) presence of extraneous facts before the jury and (2) influence on the verdict.
On the question of use of the dictionary, juror V.W.'s affidavit states:
"4. In addition to our handwritten notes from the Judge's oral jury charges, the jury forewoman, M.M., brought in a small pocket dictionary which was used to help us understand the meaning of some of the terms used in the judge's oral jury charge and on the jury verdict form. During the course of the jury deliberations, different jurors asked Ms. M. for several word definitions including, to the best of my recollection, the definitions of the words `oppressive', `conspiracy', `waste', and `wantonness.' Ms. M. looked up the requested words and read out the definitions to the members of the jury. These definitions were taken into consideration by me and the other jurors prior to voting and filling out the verdict form."
Similarly, juror K.W.'s supplemental affidavit states:
"2. During the jury deliberations on the morning of October 29, 1991, M.M., the forewoman, read to the jury the definitions of at least two words from a small dictionary which she had with her. Two of the definitions I recall that she read were for the words `oppressive' and `wantonness'. After Judge Kittrell had given us his charge on the afternoon of October 28, 1991, I was particularly concerned with the definition of the word `oppressive', and I looked up the definition of that word in a dictionary I had at the office, Webster's New World Dictionary, 3rd Collegiate Edition. On the morning of October 29, 1991, during the jury's deliberations, I read to the jury the definition of `oppressive' which I had obtained from the Webster's Dictionary. I believe that those dictionary definitions read to the jury by Mrs. M. and me during the jury deliberations were taken into consideration by me and the other jurors and influenced us in our voting on the verdict in the above case."
"Definitions of legal terms and concepts... from general reference books (World Book and American College Encyclopedia Dictionary) are extraneous matters and fall within the exception to the general rule which, likewise, is well recognized in our case law." Nichols v. Seaboard Coastline Ry., 341 So.2d 671, 673 (Ala.1977) (emphasis in the original). The affidavits of both V.W. and K.W. show that the foreperson, M.M., brought a small pocket dictionary into the jury room and read definitions of terms from the judge's oral charge, such as "oppressive," "conspiracy," "waste," and "wantonness." K.W.'s affidavit shows that K.W. also read to the jury definitions he had looked up in a dictionary kept at his office. Both affidavits indicate that the jurors considered these definitions before voting, and K.W. stated that he believed the definitions influenced the voting. Because the affidavits show both the presence of extraneous matters and evidence of influence on the verdict, we consider the affidavits submitted by the Fultons.
The principal issue now becomes whether the juror misconduct, in the circumstances of this case, requires the granting of a new trial. In Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala.1984), this Court stated the often quoted rule concerning juror misconduct: "Juror misconduct will justify a new trial when it indicates *1249 bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law." Whitten, 447 So.2d at 658 (overruling Jones v. McMonigal, 409 So.2d 1381 (Ala.1982), to the extent Jones had excluded, as a ground for granting a new trial, extraneous matters from which prejudice may be presumed); see also Jordan v. Brantley, 589 So.2d 680 (Ala.1991) (quoting the Whitten rule); Nowogorski v. Ford Motor Co., 579 So.2d 586 (Ala.1990) (quoting the Whitten rule); Coots v. Isbell, 552 So.2d 139, 140 (Ala.1989) (quoting the Whitten rule). "In each of the cases in which we have held that the trial judge erred in failing to grant a new trial, there has been a common factorthe existence of juror misconduct that could have affected the verdict." Nowogorski, 579 So.2d at 589 (emphasis in the original); Coots, 552 So.2d at 140. Consideration of the prejudicial effect of extraneous matter has been held to be a "case-by-case determination to be made in light of the particular facts and attending circumstances." Nowogorski, 579 So.2d at 590; see also Nichols, 341 So.2d at 676-77.[10] Thus, this Court will affirm a trial court's denial of a motion for a new trial if the trial court could have reasonably found that the introduction of the extraneous matter into the jury's deliberations was not prejudicial. Jordan v. Brantley, 589 So.2d 680, 682 (Ala.1991).
Callahan argues that the defendants could not have been prejudiced by the jury's reference to the dictionary definitions. After noting that the V.W. and K.W. affidavits refer to only four words, "wantonness," "conspiracy," "oppressive," and "waste," Callahan argues:
"As to wantonness and conspiracy, the jury found in favor of the Fultons. The Fultons surely cannot argue prejudice in that regard. To the extent that `waste' was relevant in a finding against the Fultons on the mismanagement claim, there could be no prejudice because no damages were awarded thereunder. As to the question of oppression and waste, the jury's findings in favor of Callahan were advisory only."
(Emphasis in the original.)
The Fultons, however, contend that the verdict was influenced to their prejudice because the terms "oppression" and "wantonness" were part of the judge's oral charge to the jury on punitive damages:
"The law states that punitive damages may not be awarded in a tort action except where it is proven by clear and convincing evidence that the Defendant consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the Plaintiff."
(Emphasis added.) Relying on Nowogorski and Nichols, the Fultons argue, alternatively, that the dictionary definitions constituted extraneous material that was prejudicial as a matter of law.
We hold that it was reversible error to deny the Fultons' motion for new trial on the basis of juror misconduct. Considering the jury's assessment of punitive damages in this case, we hold that the trial court could not have reasonably concluded that the jury's reference to dictionary definitions of "oppression" and "wantonness" was not prejudicial. These terms were material to a finding of the type of conduct necessary to support an award of punitive damages. Moreover, the V.W. affidavit and the K.W. affidavit each states that the affiant and the other jurors considered the definitions before voting. K.W.'s affidavit states further that he believed that the definitions "influenced [the jury] in [its] voting on the verdict." Because we conclude that the Fultons have shown actual prejudice, we do not reach their argument that the use of the definitions was prejudicial as a matter of law.
*1250 We believe our holding here is consistent with our recent decisions in Jordan v. Brantley, 589 So.2d 680 (Ala.1991), and Nowogorski v. Ford Motor Co., 579 So.2d 586 (Ala.1990). In Jordan the plaintiffs filed negligence claims against a number of defendants, arising out of the misidentification of the bodies of two men killed in an automobile accident. According to juror affidavits, the jury was unable to reach a verdict until the second day of deliberations, when the jury foreperson used a dictionary to look up the meanings of "prudent" and "reasonable." Because these terms were material to resolving a key issue in the case and because the foreperson told the trial court that the dictionary definitions had influenced the jury, this Court affirmed the trial court's granting of the defendant's motion for new trial, holding that the trial court could have reasonably found that the presence of extraneous matter in the jury deliberations was prejudicial.
In Nowogorski, the plaintiff filed a claim under the Alabama Extended Manufacturer's Liability Doctrine in which the critical factual question was whether a tractor sold to the plaintiff's husband was "defective." Although the juror affidavits varied, seven of them stated that a dictionary definition of "defective" was read to the jury during its deliberations. At least one juror stated that before hearing the dictionary definition of "defective," he was more in favor of the plaintiff, but that after hearing it he was more in favor of the defendant manufacturer. The jury eventually rendered a verdict against the defendant. Finding that this evidence was sufficient to demonstrate that the juror misconduct could have affected the verdict, this Court held that the trial court had erred in denying the plaintiff's motion for a new trial.
As in Jordan and Nowogorski, the juror affidavits in this case indicate that the jury considered dictionary definitions of terms material to a key issue in the case. Moreover, as in Nowogorski, at least one juror affidavit in this case stated that the juror believed that the jury's consideration of the definitions influenced the jury. The Court in Nowogorski held that the statement of the juror who said that he was more in favor of the defendant after hearing the definition than before was sufficient evidence of prejudice, even though the jury eventually rendered a verdict against that defendant:
"We have carefully examined the record in this case. Mrs. Nowogorski's claim that the jurors' verdict was affected by the reading of some key definitions out of Webster's New Collegiate Dictionary is supported by the affidavits presented. Here, as in Whitten and Nichols, at least one juror testified that this decision about the case was influenced by the extraneous dictionary definitions to be `more in favor' of Ford than in favor of the plaintiff. This evidence is sufficient to prove that the verdict was affected by juror misconduct."
Nowogorski, 579 So.2d at 590 (emphasis added). Thus, the inquiry is whether the dictionary definitions could have influenced the decision-making of the jury, not whether the jury's consideration of the definitions necessarily determined the outcome. Because we find that the juror misconduct in this case could have affected the verdict, we hold that the trial court erred in not granting the Fultons' motion for new trial.

III.
The Fultons allege various other forms of juror misconduct: bias or prejudice, material alterations of the verdict form, and failure to follow the court's instructions. Because we reverse and remand for a new trial on the basis of the jury's use of a dictionary, we pretermit discussion of these other allegations of juror misconduct.

IV.
The Fultons challenge the trial court's award of equitable relief on two bases. First, the Fultons argue that the trial court's findings were plainly and palpably wrong. Second, the Fultons argue that, notwithstanding the propriety of the trial court's findings, the trial judge did not have the authority under § 10-2A-196, Ala. *1251 Code 1975, to dismiss duly elected officers and directors of the corporation and order a procedure for filling their vacancies and continuing the business indefinitely as a going concern.
Section 10-2A-195, Ala.Code 1975, grants a circuit court the power to dissolve and liquidate a corporation in an action brought by a shareholder, when it is established:
"a. That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or
"b. That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or
"c. That the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired upon the election of their successors; or
"d. That the corporate assets are being misapplied or wasted; or
"e. That the corporation is insolvent."
Ala.Code 1975, § 10-2A-195(a)(1) (1980 Ala.Acts, No. 80-633, § 108); see also Levine v. Beem, 608 So.2d 373 (Ala.1992). The substance of this Code provision was adopted by Alabama in 1959; see 1959 Ala. Acts, No. 414, § 78, at 1095 (codified at Tit. 10, § 21(78), Ala.Code 1940 (recompiled 1958), repealed, 1980 Ala.Acts, No. 80-633), and like much of the Alabama Business Corporation Act, it is derived from the ABA Model Business Corporation Act. Before 1959, the common law governed involuntary liquidation and the appointment of receivers.
Section § 10-2A-196 sets out the procedures and powers of a circuit court in liquidating a corporation:
"(b) After a hearing had upon such notice as the court may direct to be given to all parties to the proceedings and to any other parties in interest designated by the court, the court may appoint a liquidating receiver or receivers with authority to collect the assets of the corporation...."
The Fultons argue first that the trial judge's findings were plainly and palpably wrong. Because the trial court adopted the advisory findings of oppression and waste or misapplication of corporate assets, this Court directs its review "as if the trial judge had heard the case unaided by the jury's advice." McCaghren v. McCaghren, 294 Ala. 89, 312 So.2d 384, 385 (Ala.1975); see also Jackie Fine Arts, Inc. v. Berkowitz, 448 So.2d 318, 321 (Ala.1984). This Court will revise the findings of trial judges on questions of fact "only where, after making proper allowances and indulging all reasonable intendments in favor of the court below, we reach the clear conclusion that the findings are unsupported by the evidence or that the judgment is palpably wrong as being against the great weight of the evidence." Berkowitz, 448 So.2d at 321.
The Fultons argue that under Alabama case law, appointment of a receiver is an extreme remedy, justified only when the facts disclose a scheme on the part of the directors or majority shareholders to wreck the corporation and dissipate its assets and the minority shareholder proves that serious loss and complete ruin is inevitable and imminent. The Fultons contend that Callahan failed to establish either a scheme to wreck the corporation and dissipate its assets or an inevitable and imminent risk of serious loss and complete ruin to the underlying corporate assets that would justify appointment of a receiver.
The Fultons' argument emphasizes the extreme nature of the remedy and the traditional view that it is proper only to preserve underlying corporate assets from imminent serious loss caused by the wrongful conduct of those shareholders in control of the corporation. In support of their argument, the Fultons cite decisions of this Court in Phinizy v. Anniston City Land Co., 195 Ala. 656, 71 So. 469 (1916), Gettinger v. Heaney, 220 Ala. 613, 127 So. 195 (1930), and Lost Creek Coal & Mineral *1252 Lands Co. v. Scheuer, 222 Ala. 400, 132 So. 615 (1931).
In Phinizy, this Court declared the long-standing view of dissolution and appointment of receivers in Alabama:
"The doctrine which justifies the drastic intervention of equity courts in corporate affairs in the mode here sought is grounded on the theory that the valuable rights of minority stockholders can be rescued, along with those of a recalcitrant majority, from a common ruin. It does not contemplate the infliction of any loss or injury upon the majority stockholders in order that the minority may be benefited. To help the one class by hurting the other would be an indefensible wrong.
"It needs no argument to show that this power of intervention, however wholesome and necessary its exercise may sometimes be, is extremely dangerous in its tendencies, and should be exercised only in the plainest cases. It is not enough that the past prosecution of the corporate enterprise or business has been a financial failure, nor is it enough that its future prosecution will probably be devoid of profit, however strong the probability may seem. On the contrary, so long as the corporation is a going concern; so long as it possesses the means and ability to pursue one or more of its primary purposes or lines of business; and so long as the conditions exhibited do not demonstrate to a moral certainty that its continuation must by inevitable necessity result in serious loss in the near future, and in complete ruin sooner or latera court of equity will not and should not deprive the majority stockholders of their right to carry on their business under their chosen management, however speculative and uncertain its prospects may seem to a disapproving and dissentient minority.
"Those who embark in a corporate enterprise as stockholders do so under an implied agreement that the business shall be controlled and directed by a majority of the stockholders."
195 Ala. at 660-61, 71 So. at 471. In Gettinger v. Heaney, this Court summarized the rule:
"It is too well settled to permit a doubt that a minority stockholder is entitled to the appointment of a receiver, where the corporation has failed of its purpose, or where the facts disclose a scheme on the part of the directors or a majority stockholder to wreck the corporation and dissipate its assets, and the board of directors, being, as to the stockholders, trustees of the corporate property and affairs, may be deprived of their power, `when, by fraud, conspiracy, or covinous conduct, or extreme management, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate entente cordiale is unfairly destroyed.'"
220 Ala. at 617, 127 So. at 198.
While these cases remain the law in Alabama, the adoption in 1959 of what is now § 10-2A-195(a)(1) "liberalized the law regarding dissolutions" and extended the jurisdiction of the court to dissolve and liquidate corporations. Abel v. Forrest Realty, Inc., 484 So.2d 1069, 1072 (Ala.1986); see Belcher v. Birmingham Trust Nat'l Bank, 348 F.Supp. 61, 148 (N.D.Ala.1968) (construing Tit. 10, § 21(78), Ala.Code 1940). The inclusion of "illegal, oppressive or fraudulent" acts by "directors or those in control," as grounds for appointment of a receiver under § 10-2A-195(a)(1), reflects the legislative extension of the remedy to do more than just protect or rescue the underlying assets of the corporation from wilfully destructive conduct of controlling shareholders. Consonant with this legislative expansion of protectible interests is this Court's recognition of a duty on the part of majority shareholders to act fairly toward minority interests. Burt v. Burt Boiler Works, Inc., 360 So.2d 327, 331 (Ala. 1978).
Even before the enactment of the provision now codified at § 10-2A-195(a)(1), this Court recognized in Altoona Warehouse Co. v. Bynum, 242 Ala. 540, 7 So.2d 497 (1942), the protection of these interests by appointment of a receiver:

*1253 "That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are `frozen out,' that business immorality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of directors of a corporation are but trustees of an estate for all the stockholders, and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy, or covinous conduct, or extreme mismanagement, the rights of [a] minority of stockholders are put in imminent peril and the underlying, original, corporate entente cordiale is unfairly destroyed. It would be a sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality toward one of its conflicting parties, or has put the estate in a fix [because of which] it is liable and likely to be either wasted or destroyed, or [has] mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate."
242 Ala. at 546, 7 So.2d at 502 (emphasis added) (quoting 6 Thompson § 4628, at 528 (3d ed. 1927)). In Altoona Warehouse Co., "entente cordiale" was defined as "the mutual confidence in the integrity of purpose and effort to carry on the affairs of the business of the corporation for the benefit of all the stockholders." 242 Ala. at 545, 7 So.2d at 502.
Thus, we conclude that Callahan did not have to show that the Fultons willfully wrecked the corporation and dissipated its assets and that the corporation's assets were in imminent danger of serious loss. As § 10-2A-195(a)(1) provides, Callahan only had to prove one of the enumerated grounds for appointment of a receiver. Both the jury, through its special advisory interrogatory, and the court found "oppression" and "waste." With regard to the trial court's finding of a breakdown of entente cordiale, we construe Altoona Warehouse Co. to require proof only that, because of intentional misconduct, "the rights of [a] minority of stockholders are put in imminent peril and the underlying, original corporate entente cordiale is unfairly destroyed." 242 Ala. at 546, 7 So.2d at 502.
After carefully considering all the facts and circumstances in light of the standard of review, we cannot say that the trial court's findings were not supported by the evidence or were against the great weight of the evidence. From the Fultons' conduct during the buy-out negotiations and other facts and circumstances, the trial court could have inferred that the Fultons had oppressed Callahan. Furthermore, the trial court could have inferred that intentional misconduct by the Fultons had destroyed the corporate entente cordiale and that Callahan's minority rights and interests were in imminent danger of serious loss.
The Fultons' second argument is that while § 10-2A-196(b) authorizes the court to appoint a liquidating receiver "to collect the assets of the corporation," it does not give the court the power to remove properly elected directors, to order a procedure for appointing a new board, or to appoint receivers to continue the business indefinitely as a going concern. Because a provision of the trial court's January 8, 1992, order directed the new board of directors to present a plan of liquidation, we do not address the issue of the trial court's power under the statute to appoint and authorize a receiver to manage and continue a business as a going concern.
What the Fultons are disputing here in their second argument is not so much the court's jurisdiction to liquidate the corporation as the court's authority or power to frame the remedy as it did. The court clearly has the discretion to appoint a liquidating receiver under § 10-2A-196(b) if it makes a finding of one of the jurisdictional grounds of § 10-2A-195(a)(1).
Although the language of § 10-2A-196(b) does not specifically give a circuit *1254 court the power to remove duly elected directors and appoint new ones, that section does not limit the power of a circuit court to frame its judgment to afford equitable relief. Section 10-2A-76, Ala.Code 1975, preserves unimpaired the court's equitable jurisdiction to prevent or remedy fraud, oppression, and other inequitable conduct:
"Neither an unqualified statement of rights or powers, nor an unqualified grant of authority herein, shall be taken or construed, to abrogate, repeal, displace, modify or impair ... the jurisdiction of the courts to grant relief by way of injunction or otherwise, in order to forestall, prevent, correct, remedy or allow damages for fraud, oppression, imposition or other inequitable or remedial conduct in conformity with the applicable principles and practices of law."
In Abel v. Forrest Realty, Inc., 484 So.2d 1069 (Ala.1986), this Court affirmed a trial court's refusal to dissolve a corporation, stating that "the ultimate decision of whether to dissolve a corporation must be made by the trial court, guided by equitable principles, based on the particular facts of each case." 484 So.2d at 1071. Likewise, "It is also in the very nature of equity proceedings that the trial court is authorized to mold its decrees so as to adjust the equities of all parties and to meet the obvious necessities of each situation." Coupounas v. Morad, 380 So.2d 800, 803 (Ala.1980) (imposing constructive trust on second newly formed corporation in favor of original corporation to remedy the usurping of a corporate opportunity). We hold that in the circumstances of this case, it was within the equitable jurisdiction of the trial court to frame its judgment to provide for the removal of the existing board of directors and the appointment of a new one to formulate a plan of liquidation.

V.
Because the trial court committed reversible error in denying the Fultons' motion for a new trial on the basis of juror misconduct, the judgment on the jury verdict must be reversed. There was sufficient evidence to submit the stock depreciation claim to the jury, so the trial court did not err in denying the motion for JNOV. The judgment is affirmed insofar as it grants equitable relief.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
HOUSTON, J., concurs specially.
HOUSTON, Justice (concurring specially).
I write only to address the issue of minority shareholder "squeeze-out." There is confusion as to whether this cause of action sounds in tort or in contract, which was caused in no small part by footnote 13 to my special opinion concurring in part and dissenting in part in Ex parte Brown, 562 So.2d 485, 500 (Ala.1990), and by my unpublished dissent in Michaud v. Morris, which was withdrawn when "the brethren" saw the light and reversed themselves and the trial court in a second opinion. Michaud v. Morris, 603 So.2d 886 (Ala.1992).
In Ex parte Brown, this Court was presented with a motion filed under Rule 59, A.R.Civ.P., to alter, amend, or vacate the final order and to consider, among other things, the "tort of squeeze-out." I was so convinced in Ex parte Brown that there was no "squeeze-out," no matter what type of claim it was, that I was not concerned with classifying it. The majority granted relief to the plaintiffs in Ex parte Brown; therefore, I assumed that the majority of this Court had recognized what the Court was asked to recognize: the plaintiffs' "tort of squeeze-out." Because of this, in my unpublished dissent to the withdrawn and unpublished first opinion in Michaud v. Morris, I described the majority's action as "extending the tort of squeeze-out to impermissible limits."
I gather that there is confusion among the bench and bar as to what we have done with or what we have done to the cause of action for "squeeze-out," based upon the *1255 excellent articles that have appeared in The Alabama Lawyer. See Andrew P. Campbell, Litigating Minority Shareholder Rights and the New Tort of Oppression, 53 Ala.Law. 108 (1992), and Michael E. DeBow, "Oppression" of Minority Shareholders: Contract, Not Tort, 54 Ala.Law. 128 (1993).
If the majority of this Court does not think that it has adopted a tort of "squeeze-out" by its decision in Ex parte Brown so that we are bound by stare decisis, then "squeeze-out" of minority shareholders is a contractual action. Corporate law is a form of contract law; and "squeeze-out" should be a contractual action, because the minority shareholders' injuries flow from a breach of an implied contractthe behavior of the majority shareholders (officers, directors, etc.) violates the reasonable expectations of the minority shareholders that is "generated by the business relationship which the contract created." F. Hodge O'Neal, Introduction (Symposium: Rights of Minority Shareholders), 22 Wake Forest L.Rev. 1, 6 (1987).
NOTES
[1] When Callahan filed this action, the shares of The Finch Companies, Inc., were held in the following percentages:

H.L. Callahan, director 48.9%
Scott Callahan, director 0.1%
Elizabeth J. Fulton, director, secretary and treasurer 27.2%
Samuel C. Fulton, director and senior vice-president 3.6%
Thomas W. Fulton, director and president 5.1%
Daniel R. Fulton, director and vice-president 5.1%
Mrs. Thomas W. Fulton 5.0%
Mrs. Daniel R. Fulton 5.0%
Thus, the Fultons owned 51%, and the Callahans owned 49%.

[2] The Fultons also counterclaimed, alleging that before the consolidation that created The Finch Companies, Inc., Callahan had breached a duty of undivided loyalty. The Fultons claimed that as president of Finch Warehousing and Transfer Company, Inc., Callahan had breached this duty by establishing, with others, a competing warehousing and transporting business called Great Southern Corporation. Upon Callahan's motion, the trial court dismissed the Fultons' counterclaim as barred by the running of the statutory period of limitations. No issue is raised as to this ruling.
[3] For purposes of brevity, we refer to the trial judge's third finding as "breakdown of the corporate entente cordiale." In phrasing his finding in the order, the trial judge stated that "the mutual confidence in the integrity of purpose and effort to carry on the affairs of the business of the corporation for the benefit of all shareholders has been destroyed." In Altoona Warehouse Co. v. Bynum, 242 Ala. 540, 7 So.2d 497 (1942), this Court used almost identical language to define the destruction of "corporate entente cordiale."
[4] This plan called for borrowing around $2 million and selling the equipment for $1.7 million. In his testimony at trial, Thomas admitted that if all had gone according to plan, the corporation would have able to save between $400,000 and $500,000 in losses that the trucking division later incurred. Thomas emphasized, however, that there was no assurance that the corporation would have been able to sell the trucks for $1.7 million under existing market conditions in so short a time.
[5] The offer terms included a $300,000 cash down payment, financing of the balance over 10 years, cancellation of Callahan's debt, and sums to pay tax liabilities.
[6] Letters to Callahan and testimony from the Fultons indicated that Betty wanted a proper valuation in order to avoid possible I.R.S. penalties and additional taxes for undervaluing the stock.
[7] These two transfers equalled 20% of the total shares outstanding.
[8] Annual financial statements show the decline in the corporation's profitability after entering the long-haul freight business:

 1985 1986 1987 1988
 ---- ---- ---- ----
GrossRevenues 2,700,000 3,600,000 4,100,000 4,000,000
Net Operatinglncome 100,317 197,624 295,005 172,682
Net Income 148,651 280,505 377,553 494,958
 ---------------------------------------------
 1989 1990
 ---- ----
GrossRevenue 6,500,000 7,800,000
Net Operatinglncome (273,229) (146,108)
Net Income (111,551) 5,101

[9] In giving his oral instruction on this claim, the trial judge read the text of the statute to the jury.
[10] This phrase quoted from Nowogorski is based upon Justice Bloodworth's special concurring opinion in Nichols, in which Justices Maddox, Almon, Shores, Embry, and Beatty concurred. Justice Jones's lead opinion in Nichols, in which Justice Faulkner concurred, would have found prejudice as a matter of law, but the majority disagreed with Justice Jones's view on this point.